CROOK, HORNER & CO. v. OLD POINT COMFORT HOTEL CO. et al.

(Circuit Court, E. D. Virginia. February 28, 1893.)

1. CONSTITUTIONAL LAW — JURISDICTION OF UNITED STATES OVER FORTS, ETC., —LANDS CEDED BY STATES.

The clause in the federal constitution (article 1, § 8, cl. 17) giving the United States exclusive jurisdiction over all places purchased by the consent of the legislature of the state in which the same shall be for the erection of forts, arsenals, etc., has only the meaning of an acquisition of land by actual purchase accompanied by a cession of jurisdiction by the state; and where land is acquired by the United States directly from the state as owner by an act of cession, (as in the case of Fortress Monroe,) the constitutional provision does not apply, and the United States holds the land only by the tenure prescribed in the act of cession. Railroad Co. v. Lowe, 5 Sup. Ct. Rep. 995, 114 U. S. 525, and Railroad Co. v. McGlinn, 5 Sup. Ct. Rep. 1005, 114 U. S. 542, followed.

2. SAME—FORTRESS MONROE—VIRGINIA LAWS IN FORCE.

The general laws of Virginia, other than criminal, which are not in conflict with those of the United States relating to forts, and which do not interfere with the military control, discipline, and use by the United States of Fortress Monroe as a military post, are in force at Old Point Comfort, and are especially in force in those parts and places at Old Point Comfort which have been appropriated to other than the military purposes of the United States.

3. SAME—MECHANIC'S LIEN LAWS.

Certain mortgages were given for the purpose of raising money to construct the Chamberlin Hotel at Old Point Comfort, and were duly recorded according to law in the clerk's office of Elizabeth City county court. Certain liens of mechanics and material men for work and labor performed on such hotel were also filed according to law. Held, that Code Va. 1887, § 2483, giving mechanics' liens priority over mortgages, applied in this case.

In Equity.    Bill by Crook, Horner & Co. against the Old Point Comfort Hotel Company and others, praying for the adjudication of liens, the appointment of a receiver, the completion by the court of the unfinished hotel building of the defendant company, the sale thereof after its completion, and other relief.    On exceptions to the master's report. Sustained in part.

White & Garnett, for complainant.

Tunstall & Thom, for defendant Old Point Comfort Hotel Co. and trustee.

Thomas Tabb, Harmanson & Heath, Sharp & Hughes, and R. S. Bickford, for claims of mechanics and material men.

HUGHES, District Judge. This case is heard on sundry exceptions to the report of the master in chancery appointed by the court, marshaling the liens resting on the property of the hotel company. This property consists exclusively of an unfinished hotel building of large dimensions and cost, called the "Chamberlin Hotel," and standing on land belonging to the United States by cession from the state of Virginia.

The principal question before the court is upon the priority of liens. The hotel building is under a mortgage from the defendant company to the Knickerbocker Trust Company of New York city as trustee, executed for the purpose of securing bonds to a large amount, which have been sold for moneys expended in constructing the building. In competition with the mortgage are a number of liens filed by mechanics and others who have expended labor and used material upon the unfinished structure. This mortgage and these liens have been filed and registered in the clerk's office of the county court of Elizabeth City county, Va., in which the lands of the United States at Old Point Comfort lie. They have been registered in pursuance of registration laws in force in Virginia. A principal question in the case is whether the general laws of Virginia, especially her registration laws, are in force in the territory at Old Point Comfort, or Fortress Monroe, held by the United States under cession from Virginia.

The history of the cession, and the legislation ensuing upon it, is as follows: On the 1st of March, 1821, the general assembly of Virginia passed the following act:

"Whereas, it is shown to the present general assembly that the government of the United States is solicitous that certain lands at Old Point Comfort and at the shoal called the 'Rip Raps' should be, and with the right of property and entire jurisdiction thereon, vested in the said United States for the purpose of fortification and other objects of national defense: (1) Be it enacted by the general assembly, that it shall be lawful and proper for the governor of this commonwealth, by conveyance or deeds in writing under his hand and the seal of the state, to transfer, assign, and make over unto the said United States the right of property and title, as well as all the jurisdiction which this commonwealth possesses over the lands and shoal at Old Point Comfort and the Rip Raps: provided, the cession at Old Point Comfort shall not exceed two hundred and fifty acres, and the cession of the shoal at the Rip Raps shall not exceed fifteen acres: and provided, also, that the said cession shall not be construed or taken so as to prevent the officers of the state from executing any process or discharging any legal functions within the juris-

diction or territory herein directed to be ceded, nor to prevent, abolish, or restrain the right and privilege of fishery hitherto enjoyed and used by the citizens of this commonwealth within the limits aforesaid: and provided, further, that nothing in the deed of conveyance, required by the first section of this act, shall authorize the discontinuance of the present road to the fort, or in any manner prevent the pilots from erecting such marks and beacons as may be deemed necessary. (2) And be it further enacted, that should the said United States at any time abandon the said lands and shoal, or appropriate them to any other purpose than those indicated in the preamble to this act, that then, and in that case, the same shall revert to and revest in this commonwealth. (3) This act shall commence and be in force from and after the passing thereof."

It is evident that this act contemplated the use of this land simply for a fort, and that its use for any other purpose should cause a reverter both of title and of jurisdiction to Virginia. Its use for hotel purposes in competition with other parts of Virginia equally favored by nature was not only not contemplated, but by the reverter clause was forbidden. This is the only act of cession by a state to the United States which contains such a clause. All acts of cession contain the provision allowing the service of process. But in the various acts none appear to have this reverter clause. It is to be observed also that the title of the government to the lands at Old Point was obtained by direct cession from the state, of land till then belonging to the state; and not by purchase from private individuals within the state, under consent from the state. The importance of this distinction will appear hereafter.

In connection with this subject it may be observed that Virginia, in a code of general laws passed on the 15th day of August, 1849, enacted, with reference to her cession of lands at Old Point Comfort, and over other places within her territory, designated in the act, as follows:

"It is hereby declared that this state retains concurrent jurisdiction with the United States over the said places, so far as it lawfully can, consistently with the acts [of cession;] and its courts, magistrates, and officers may take such cognizance, execute such process, and discharge such other legal functions within the same as may not be incompatible with the true intent and meaning of the said acts." Code 1849, p. 59.

The said hotel was erected, and the use of the public land of the United States on which the same stands, was acquired from the United States, and is held subject to its control and supervision, under and by virtue of the following act:

"Resolved by the senate and house of representatives of the United States of America in congress assembled, that the secretary of war be, and he is hereby, authorized to grant permission to John F. Chamberlin to build a hotel upon the lands of the United States at Fortress Monroe, Virginia, upon such site, and with such plans and dimensions, as may be approved by the secretary of war: provided, that the state of Virginia, by its general assembly and governor, shall by proper legal enactment give the consent of said state to the erection of such hotel, and that the building or buildings erected shall be removed at the expense of the owner or owners whenever the secretary of war shall so direct; and no claim for damages by reason of such removal shall be made upon the government of the United States: and provided, further, that the building so erected shall be subject to state and national taxation as other property. Approved March 3, 1887."

See 24 U. S. St. at Large, p. 648.

In accordance with this resolution, the secretary of war granted to John F. Chamberlin permission to erect said hotel on the site whereon it now stands, according to certain plans and dimensions, and subject to the restrictions imposed by the joint resolution. On the 30th day of March, 1887, the general assembly of Virginia gave its consent to the erection of the hotel on said lands, subject to certain restrictions and conditions, (see act of said assembly, chapter 11, Acts Ex. Sess. 1887,) as follows:

"Be it enacted by the general assembly of Virginia, that the consent of the state of Virginia is hereby given to John F. Chamberlin to erect a hotel upon the lands of the United States at Fortress Monroe, in accordance with a joint resolution of the congress of the United States, authorizing him to erect a hotel; but the said building, property, or business connected therewith or transacted therein shall be liable to the same taxes as any other property or licensed business in the commonwealth of Virginia. And this consent is granted upon the further condition that all taxes and assessments upon the said property in favor of the commonwealth of Virginia are to be paid in currency, and not in coupons."

On the 18th day of February, 1890, Chamberlin sold and conveyed all his rights and privileges under the resolution of congress and the permission granted by the secretary of war and the state of Virginia to the defendant company, the Old Point Comfort Hotel Company. Pursuant to the act of March 1, 1821, David Campbell, as governor, made a deed to the United States, which was admitted to record in the county court of Elizabeth City county on December 12, 1838. This deed recites the statute of cession, and grants, transfers, conveys, and cedes to the United States "all the right of property and title and jurisdiction" of the commonwealth of Virginia to the property ceded.

In respect to territory derived from the states by the United States, the following clause is embodied in the constitution of the United States, (article 1, § 8, cl. 17:)

"Congress shall have power to exercise exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square) as may by cession of particular states and the acceptance of congress become the seat of government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be for the erection of forts, magazines, arsenals, dock yards, and other needful buildings."

While congress has enacted a complete criminal code in relation to crimes committed within places within which it has exclusive jurisdiction and on the high seas, it has provided no laws for the government in civil matters of the inhabitants of forts, arsenals, magazines, and dock yards. These places, when acquired in the manner defined by the clause of the national constitution just quoted, are without laws in civil matters, except such general laws as may have been in force respectively in the states from which the United States derived them at the time of acquisition. The land at Old Point Comfort derived by the United States from Virginia has come, under various influences, to contain a good many inhabitants. Fortress Monroe is, in inclosed area, one of the largest fortresses known to exist. It has been made the seat of an artillery school of instruc-

tion, which brings together an unusual number of soldiers, officers, and their families. A very large hotel has been in operation there many years, established first for the accommodation of army officers and their families, but grown since into a watering place and sanitarium for the general public. The eastern terminus of the Chesapeake & Ohio Railroad has been established on this land by the consent of congress and of the state of Virginia. An electric railroad to Newport News, of much importance, has its eastern terminus on these grounds. Under the operation of these causes, a considerable number of inhabitants find themselves sojourning, for longer or shorter periods, at Old Point Comfort, upon land held by the United States. Congress having failed to enact any legislation for the government, in civil affairs, of persons sojourning permanently or temporarily at military posts, upon grounds held by the United States, it is important to inquire whether the inhabitants of Old Point Comfort are without law governing their social and civil life, and their transactions in business and commerce, except such as may have been in force in Virginia more than half a century ago. It will have been observed from the clause of the constitution which has been quoted that its language is that congress shall have power of exclusive legislation "in all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, arsenals," etc. This language has been construed by the supreme court of the United States in the cases of Railroad Co. v. Lowe, 114 U. S. 525, 5 Sup. Ct. Rep. 995, and Railroad Co. v. Mc-Glinn, 114 U. S. 542, 5 Sup. Ct. Rep. 1005, in which it was held that the word "purchase," as used in the clause of the constitution under consideration, has not the general technical meaning belonging to it at common law of any acquisition of lands other than by descent or inheritance, but has only the meaning of an acquisition of land by actual purchase. It held, moreover, that where land is acquired by the United States in any other manner than by such actual purchase, with the consent of the state, attended by a cession from the state of all jurisdiction over it, there the clause of the constitution giving the power of exclusive legislation to congress, and giving exclusive jurisdiction to the United States, does not apply. The court held that in this class of cases the United States takes the lands only under such a tenure, limited or unlimited, as the state confers by each special act of cession, and that such title is to be dealt with by the courts precisely as if the land had been ceded by the state to a private individual.

In the McGlinn Case, describing its decision in the Ft. Leavenworth Case, the supreme court said:

"In order that the United States may possess exclusive legislative power over the tract, * * * they must have acquired the tract by purchase, with the consent of the state. This is the only mode prescribed by the federal constitution for the acquisition of exclusive legislative power over it. When such legislative power is acquired in any other way, as by an express act ceding it, its cession may be accompanied with any conditions not inconsistent with the effective use of the property for the public purposes intended. We also held that it is competent for the legislature of a state to cede exclusive jurisdiction over places needed by the general government in the execution of its

powers, the use of the places being in fact as much for the people of the state as for the people of the United States generally, and such jurisdiction necessarily ending when the places cease to be used for those purposes."

However much these decisions may have disturbed opinions previously entertained by the legal profession, they are the supreme law of the land, and must be enforced by the courts. An inspection of the act of cession of Virginia conveying to the United States the lands of Old Point Comfort, belonging to herself, and not purchased by the United States, with her consent, from any other owner, and ceding jurisdiction over them, will show that the case falls within the ruling of the supreme court in the two cases of Railroad Co. v. Lowe and Railroad Co. v. McGlinn; and that Fortress Monroe is held by the United States, not subject to clause 17, § 8, art. 1, of the constitution, but only by the tenure prescribed by Virginia's act of cession of March 1, 1821, and her governor's deed of cession of December 12, 1838. These acts contain quite a number of very material limitations of the power of the United States over the land at Old Point Comfort, and provide expressly for the reversion of the land to this commonwealth, and their revestment in her, in the event of their future abandonment by the United States, or appropriation to any other purposes than those of fortification and national defense.

As to the question what law prevails in places ceded to the United States, the supreme court says, generally, in the McGlinn Case, (page 546, 114 U. S., and page 1006, 5 Sup. Ct. Rep.:)

"With respect to laws affecting the possession, use, and transfer of property, and designed to secure good order and peace in the community, and promote its health and prosperity, which are strictly of a municipal character, the rule is general that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed;" citing Insurance Co. v. Canter, 1 Pet. 542.

It held specially that where laws thus left in force after the dates of cession reserved in one case a right of taxing certain property on the lands of the United States, and in the other case the right to recover damages for certain acts of negligence committed on such lands, such provisions of law could be enforced at any time after the cession.

But these cases, nor any other decisions of the supreme court that I can find, do not go to the extent of declaring that the laws of a state passed after lands and jurisdiction over them have passed from the state to the United States, affect the inhabitants and business transactions of the ceded localities. Whether such subsequent laws do, is the principal question presented by the case at bar, and, in that respect, is a case of first impression. This question will, of course, be considered by me only with reference to the lands at Old Point Comfort, ceded by Virginia to the United States. In the course of its decision in the case of Railroad Co. v. Lowe, supra, the supreme court says, (page 539, 114 U. S., and page 1002, 5 Sup. Ct. Rep.:)

"Where lands are acquired in any other way by the United States within the limits of a state than by purchase with her consent, they will hold the lands subject to this qualification, [viz.] that if upon them forts, arsenals, or other public buildings are erected for the uses of the general government, such

buildings, with their appurtenances, as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed. * * * But when not used as such instrumentalities the legislative power of the state over the places acquired will be as firm and complete as over any other places within their limits. As already stated, the land constituting the Ft. Leavenworth Military Reservation was not purchased, but was owned by the United States by cession from France many years before Kansas became a state; and whatever political sovereignty and dominion the United States had over the place comes from the cession of the state since her admission into the Union. It not being a case where exclusive legislative authority is vested by the constitution of the United States, that cession could be accompanied by such conditions as the state might see fit to annex, not inconsistent with the free and effective use of the fort as a military post."

And on page 542, 114 U. S., and page 1004, 5 Sup. Ct. Rep., the court, after saying that over forts and arsenals not purchased by consent of a state, and over which, therefore, exclusive jurisdiction is not conferred by the constitution, it can perceive no reason why the states should not by their own act grant legislative authority and political jurisdiction to the United States, remarks that "such cession is necessarily temporary," and that the jurisdiction thus conferred can be exercised by the United States "only so long as the places continue to be used for the public purposes for which they were acquired or reserved from sale. When they cease to be thus used, the jurisdiction reverts to the state."

I think it is clear from the foregoing recital that the jurisdiction of the United States over the territory held by them at Old Point Comfort is not the absolute, exclusive jurisdiction conferred by the federal constitution over places purchased by consent of states; but is such jurisdiction only as was conferred by Virginia's act and deed of cession. It would seem to be equally clear that, except as to the parts of that territory not in actual use by the federal government for military purposes, whether appropriated to other purposes or not, the jurisdiction of the state is concurrent with that of the United States, and that such laws of Virginia as are not incompatible with those of the United States affecting that territory, and as do not conflict with the free use by the United States of the parts of the land actually used for military purposes, are themselves in force, and constitute the rule of conduct for the government of all inhabitants there who do not belong to the army of the United States.

It is plain that the resolution of congress of March 3, 1887, relating to the Chamberlin Hotel, and the act of assembly of Virginia of March 30, 1887, on the same subject, both treat this hotel and its site as a diversion of that part of the cession obtained from Virginia by the United States from the purposes for which it was ceded. If so, what is the jurisdictional status of that hotel? Has it not reverted to the state, to remain under its jurisdiction so long as it continues to be used for other than military purposes, subject to such laws of the state as do not interfere with or conflict with the free and full use by the United States, for military purposes, of the rest of the land ceded to and held by them at Old Point Comfort? If this be not the true jurisdictional status of the Chamberlin Hotel

and its site, it would be very difficult to conceive and to define what their status is.    It seems to me to be a necessary and an inevitable conclusion that the Chamberlin property has reverted jurisdictionally to Virginia, subject to such continued control by the United States as may be necessary to the discipline of the military post and the effective use of the post for military purposes.    Subject to these limitations, it results that the laws of Virginia of a general character, such as do not conflict with the purposes for which the United States hold the land at Fortress Monroe, are in force there, especially in the places, like the Chamberlin Hotel, which have been appropriated to other than the military purposes for which only they were ceded by Virginia.    If these conclusions be not true, then, except state laws more than half a century old, the hundreds of inhabitants engaged in civil pursuits and residing at Old Point Comfort are living in a No-Man's Land, and, except in a criminal sense, are as complete outlaws as if they were at Botany Bay.

I am aware that the argumentum ab inconvenienti cannot be held to enact laws if they do not actually exist; but when reason and legitimate statutory construction show that state legislation is in force in places where, if not, there would be no law at all, the inconvenience of holding otherwise comes in aid of the adopted construction.    Let me emphasize the fact that this decision goes no further than to hold that the general laws of Virginia, other than criminal, which are not in conflict with those of the United States relating to forts, and which do not interfere with the military control, discipline, and use by the United States of Fortress Monroe as a military post, are in force at Old Point Comfort, and are especially in force in those parts and places at Old Point Comfort which have been appropriated to other than the military purposes of the United States.

It is useless to discriminate the case at bar from that of Foley v. Shriver, 81 Va. 568, in which the supreme court of appeals of Virginia held that an ordinary civil process of garnishment could not be served within the Soldiers' Home at Hampton.    That land was acquired by purchase with Virginia's consent and a cession of state jurisdiction, and the power of legislation over it became exclusive in congress by force of the federal constitution.

In a geographical sense, Fortress Monroe is a part of Virginia, and of Elizabeth City county of Virginia.    So far as Virginia has concurrent legislative jurisdiction in the territory held from her at Old Point Comfort, that territory is part of Elizabeth City county; and under the laws of Virginia requiring wills, deeds, mortgages, and liens to be recorded in the clerk's office of the county court of the county in which they are to take effect, such instruments executed by inhabitants of Old Point Comfort are to be recorded in the clerk's office of Elizabeth City county court.    The mortgage shown by the record to have been executed for the purpose of securing bonds sold for moneys employed in constructing the Chamberlin Hotel was recorded in the office of the clerk of the county court of Elizabeth City.    Sundry liens of mechanics and material men were also filed within 30 days after the moneys claimed were

due, in the same office, for work and material put upon the building of the defendant company. The law of Virginia (section 2483, Code 1887) gives liens of the latter class priority over mortgages of the class first named, and this law must govern in the present case.

Such exceptions to the master's report, therefore, as claim priority for the liens for labor and material over the general mortgages, and were filed within one month after the filing of the master's report, are sustained.