STATE, EX REL. CASHMAN ET AL., *v*. BOARD OF COMMISSIONERS OF GRANT COUNTY.

[No. 18,774.   Filed October 13, 1899.]

CONSTITUTIONAL LAW. — *Soldiers' Home.* — *Jurisdiction of United States.* — *Retrocession to State.* — The act of Congress of July 7, 1898 (Acts Cong. 1897, 1898, p. 668), known as the retrocession act, by which the jurisdiction over certain territory purchased by the United States of the State of Indiana for the location of a branch of the National Home for Disabled Volunteer Soldiers was retroceded to the State is not violative of article 1, §8 of the Federal

State, *ex rel.*, *v.* Board, etc.

Constitution conferring upon Congress the power to acquire exclusive jurisdiction over lands purchased by the United States for certain enumerated purposes, with the consent of the State, expressed through its legislature. *pp. 307-310.*

SOLDIERS' HOME.—*Retrocession of Jurisdiction by United States to State of Indiana.*—The provision of the act of Congress of July 7, 1898 (Acts Cong. 1897, 1898, p. 668), retroceding to the State of Indiana jurisdiction over certain territory purchased by the United States for the location of a branch of the National Home for Disabled Volunteer Soldiers is not nullified by the proviso "that nothing herein contained shall be construed to impair the powers and rights heretofore conferred on the board of managers of the National Home for Disabled Volunteer Soldiers in and over said places." *pp. 310, 311.*

ELECTIONS.—*Qualification of Voters.—Inmates of Soldiers' Home.*— The qualification of the inmates and officers of the National Home for Disabled Volunteer Soldiers located in Grant county, Indiana, is to be determined by the same rules applicable to other citizens of the State since the passage of the act of Congress restoring the jurisdiction of the State over the territory occupied by the home, and they should be enumerated as other citizens of the township in the formation of election precincts. *pp. 311-313.*

APPEAL AND ERROR.—*Moot Questions.*—The Supreme Court will not give time to the examination of moot questions, the determination of which will serve no useful purpose. *p. 313.*

From the Grant Circuit Court. *Appeal dismissed.*

*John A. Kersey, Chris. C. Gordon, A. G. Smith* and *C. A. Korbly,* for appellant.

*H. J. Paulus, O. L. Cline, Steel & Radcliff, W. L. Taylor,* Attorney-General, *Merrill Moores* and *C. C. Hadley,* for appellee.

HADLEY, J.—This is a proceeding for a writ of mandamus, under the provisions of §1 of the act concerning elections, approved March 6, 1889 (Acts 1889, p. 157), to compel the board of commissioners of Grant county to re-divide into voting precincts certain territory in Center township, and to exclude therefrom certain territory alleged to be without the jurisdiction of the State.

The petition sets forth that, by an act of the General Assembly approved February 11, 1889 (Acts 1889, p. 10),

State, *ex rel., v.* Board, etc.

the State of Indiana ceded to the United States jurisdiction of a certain 304 acres of territory situate in Grant county, upon which was established, and is maintained by the United States, a branch of the National Home for Disabled Volunteer Soldiers, containing about 2,000 inmates; and that said commissioners, pretending to act under §1 of the elections act of 1889, had, together with other territory, included in each of six election precincts of Center township a part of said 304 acres and a part of the inmates resident thereon; that said 304 acres were within the exclusive jurisdiction of the United States; that the inmates of said home were not residents of the State of Indiana nor voters therein. Prayer, that the respondent be compelled "to divide into voting precincts, containing as nearly as practicable 200 voters, and in no case containing more than 250 voters, all that part of said Center township which is within said six, so called, voting precincts, and to exclude from said voting precincts, so to be established, all of said 304 acre tract of land, which was so ceded by the State of Indiana to the United States as aforesaid, and which is occupied by said branch Home for Disabled Volunteer Soldiers."

The petition was filed in the Grant Circuit Court May 30, 1898, and on the same day an alternative writ of mandate was issued therefrom. On July 7, 1898, Congress passed and the President approved an act embracing the following provision: "The jurisdiction over the places purchased for the location of the branches of the National Home for Disabled Volunteer Soldiers, under and by authority of an act of Congress, approved July twenty-third, eighteen hundred and eighty-eight, in Grant county, State of Indiana, and upon which said branch home is located, and by authority of an act of Congress approved June fourth, eighteen hundred and ninety-seven, 'at the town of Danville, in the county of Vermilion, state of Illinois', and upon which said branch is now located, is hereby ceded to the respective states in which said branches are located and relinquished by the United States;

and the United States shall claim or exercise no jurisdiction over said places after the passage of this act: Provided, That nothing herein contained shall be construed to impair the powers and rights heretofore conferred on the board of managers of the National Home for Disabled Volunteer Soldiers in and over said places." (Acts of Congress, 1897-98, p. 668.)

The State accepted from the National Government the retrocession of the territory in controversy by an act of the General Assembly approved February 7, 1899, which is as follows: "An act to accept jurisdiction of certain lands and territory ceded by the Congress of the United States of America to the State of Indiana, and declaring an emergency.

"Whereas, On the 7th of July, 1898, the Congress of the United States passed, and the President of the United States, on the same day signed and approved an act entitled 'an act making appropriations to supply deficiencies in the appropriations for the fiscal year ending June 30, 1898, and for prior years, and for other purposes', wherein and whereby it was enacted, among other things, by the Senate and House of Representatives of the United States of America in Congress assembled, that jurisdiction over the places purchased for the location of the branch of the National Home for Disabled Volunteer Soldiers, under and by authority of an act of Congress, approved July 23, 1888, in Grant county, in the State of Indiana, and upon which said branch home is located, is hereby ceded to the State of Indiana, and relinquished by the United States; therefore,

"Section 1.   Be it enacted by the General Assembly of the State of Indiana, That the jurisdiction in and over certain lands and places in Grant county, in the State of Indiana, used for the purposes of a branch home of the National Home for Disabled Volunteer Soldiers, said jurisdiction having been heretofore, on the 7th day of July, 1898, ceded by the Congress of the United States of America, to said State of

VOL. 1

Indiana, be and the same is hereby received and accepted by said State of Indiana.

"Section 2. Whereas, an emergency exists for the immediate taking effect of this act, the same shall be in force and effect from and after its passage." (Acts 1899, p. 23.)

Appellee moves to dismiss the appeal upon the ground that, since the commencement of the action, a state of facts has arisen, from the retrocession of jurisdiction by Congress and the accepetance thereof by the State, that removes all real controversy, and leaves the question involved a mere abstract proposition that can not now be carried out or made effective by any judgment that may be rendered.

It was the duty of the commissioners, under the act of 1887, to divide Center township into election precincts as required thereby, and to include all the territory within the limits of the township that was subject to the jurisdiction of the State. How they should accomplish the division—that is, the particular boundaries of the several precincts, was a matter of discretion and judgment that can not be questioned so long as the provisions of the law are observed. It was their duty to count the male residents, over the age of twenty-one years, and apportion them to the precincts in conformity to the statute. They should enumerate men; but not determine the qualification of electors. And if it is a fact that the 304 acres, at the commencement of this suit, were without the jurisdiction of the State, but erroneously included within certain election precincts, and that, since the commencement of this action, they have been brought within that jurisdiction, without impairing the integrity of the precinct lines or unsettling the due and lawful number of male residents therein, over the age of twenty-one years, what remains now for the commissioners to do? If the precincts as now established are in conformity to law, that is the end of it. The court will not command the doing of a thing that is already done. And it is not pretended but the precinct lines, and apportionment of electors, are according to law if the terri-

tory in question is within the jurisdiction of the State, and the male residents therein are qualified voters.

The whole inquiry then comes to this: Does the State now have jurisdiction over the territory, and are the *bona fide* residents therein for six months legal voters in the precincts, from anything that has transpired since the commencement of this suit?

Appellants insist that the congressional act of July 7, 1898, known as the retrocession act, is void for being violative of article 1, section 8 of the Federal Constitution, which reads as follows: "The Congress shall have power * * * to exercise exclusive legislation, in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of government of the United States; and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings; and to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

The contention is that while the Constitution confers upon Congress the power to acquire, within the states, exclusive jurisdiction over places for "needful buildings," it does not delegate to it the power to cede jurisdiction, when once acquired, to any other power or sovereignty, and that, when the United States once acquires jurisdiction over such a place, it becomes concurrent with the use to which it is put, and remains under the exclusive jurisdiction of the National Government until the use thereof is abandoned.

The proposition is too broadly stated. The rule, as affirmed by the highest judicial decision, is to the effect that when the National Government, in the exercise of the powers granted by the above constitutional provision, acquires land

by purchase, for any of the enumerated purposes, with the consent of the state, expressed through its legislature, the grant carries with it exclusive jurisdiction over the place, and all state rights and sovereignty are excluded therefrom; and residents therein are alien to the state making the grant. *Fort Leavenworth R. Co.* v. *Lowe*, 114 U. S. 525, 5 Sup. Ct. 995; *Mitchell* v. *Tibbetts*, 34 Mass. 298; *Commonwealth* v. *Clary*, 8 Mass. 72; *Sinks* v. *Reese*, 19 Ohio St. 306. .

But when the United States acquires land for any of such purposes, without the consent of the state, either by purchase, or by the exercise of the right of eminent domain, the National Government takes and holds the land as an ordinary proprietor, except with such superior rights and powers as are essential to the accomplishment of the national purpose as limited by the act of Congress authorizing the purchase. *Fort Leavenworth R. Co.* v. *Lowe, supra; People* v. *Godfrey*, 17 Johns. 225; *Renner* v. *Bennett*, 21 Ohio St. 431, 2 Story on Const. (5th ed.), §1227.

The doctrine is that a state can not be deprived of sovereignty over the territory within its borders without its free consent indicated by some positive act of cession. It is said in *People* v. *Godfrey, supra:* "This jurisdiction can not be acquired tortiously or by disseisin of the state; much less can it be acquired by mere occupancy, with the implied or tacit consent of the state, when such occupancy is for the purpose of protection." Story, *supra*, says: "If there has been no cession by the state of the place, although it has been constantly occupied and used under purchase or otherwise, by the United States, for a fort or arsenal or other constitutional purpose, the state jurisdiction still remains complete and perfect."

That the United States may own and use places for the purposes specified, without jurisdiction over the territory, and while the jurisdiction remains in the state, is held by the following authorities: *Commonwealth* v. *Young*, Bright. (Pa.) 302; *Clay* v. *State*, 4 Kan. 49; *People* v. *Godfrey*, 17 Johns.

225; *United States* v. *Ames*, 1 Woodb. & Minot 76; *Renner* v. *Bennett*, 21 Ohio St. 431, 446.

If then, the United States can and does hold and use land purchased for "needful buildings," sometimes with and sometimes without having jurisdiction over the place, it follows that use and jurisdiction are not necessarily concurrent and inseparable. To hold that they must inseparably coëxist would be to hold that the National Government may sequester the sovereignty of a state—for sovereignty means general jurisdiction,—and no court has gone so far as to hold that Congress may seize and condemn the jurisdiction or sovereignty of a state, although it may undoubtedly condemn and take property, both real and personal. So, then, in acquiring places for needful buildings, jurisdiction over the place becomes a matter of treaty and may follow or be withheld from the grant as the state making the grant may elect; and the sequence from this is that jurisdiction is non-essential to the purpose authorized by the last clause of section 8 of article 1, now under consideration. Neither does this section, either expressly or by implication, exclude the power of Congress to retrocede the unnecessary jurisdiction it has power to accept.

And the power of Congress to receive jurisdiction, not required by the government purpose, necessarily involves the power to transfer it. That Congress has constitutional sanction to retrocede to the states jurisdiction over such places, has been often judicially declared: *McLaughlin* v. *Bank of Potomac*, 7 Grat. 68; *Foley* v. *Shriver*, 81 Va. 568; *Fort Leavenworth R. Co.* v. *Lowe*, 114 U. S. 525, 5 Sup. Ct. 995; *Clay* v. *State*, 4 Kan. 49; *Crook* v. *Old Point, etc., Co.*, 54 Fed. 604; *People* v. *Godfrey*, 17 Johns. 225; 2 Story on Const. (5th ed.), §1328; *Renner* v. *Bennett*, 21 Ohio St. 431. We concur in this view of the law and hold that Congress had constitutional authority to recede to the State the territory in question.

It will not do to say that the proviso of the retrocession act of July 7th nullified the body of the act. One means quite a different thing from the other. There is no just ground for assailing the sagacity or *bona fide* of Congress by attributing to the act a reservation of all that is granted. Congress had received from the State exclusive jurisdiction. It manifestly intended to and did reconvey all that it received "Jurisdiction over the places * * * is hereby ceded to the respective states in which said branches are located, and relinquished by the United States, and the United States shall claim or exercise no jurisdiction over such places after the passage of this act,—*Provided*, That nothing herein contained shall be construed to impair the powers and rights *heretofore conferred upon the board of managers*" of the home. Here we have the words of both purview and proviso in language plain enough. The thing ceded is exclusive jurisdiction, that is, the right to make and execute laws for the government, and protection of the territory; that reserved, is the powers and rights *heretofore conferred upon the board of managers.* And what are they? The ordinary powers of a corporation, instituted by Congress, under the Constitution, to care for disabled volunteer soldiers, the board of managers "to have power to take, hold and convey real and personal property, establish a common seal, and to sue and be sued in courts of law and equity; and to make by-laws, rules, and regulations for carrying on the *business* and *government* of the asylum, and affix penalties thereto: *Provided*, That such by-laws, rules, and regulations are not inconsistent with the laws of the United States." 14 U. S. Stat. at Large, p. 10.

The rights and powers thus conferred upon the managers have no semblance to the right to make laws, or enforce them, within the territory. By-laws are not laws, and the power to make rules and regulations and by-laws does not mean the power to make laws in any other sense than that which may be required in the maintenance of discipline among the officers and inmates; and all the rights and powers of the man-

agers relate and are limited to the "carrying on of the business and government of the institution."

Will it be contended that, under the "rights and powers" granted the board of managers, it can try and punish a stranger for trespass, or define and punish crimes and misdemeanors, or provide and enforce a school system within the territory, or render valid civil judgments? A mere statement of the question exposes its absurdity; and if such rights and powers were not conferred upon the board of managers by the law of its creation, then they were relinquished to the State by the retrocession act of July 7th. This is clear; so we perceive no ground for the contention that the proviso reserved jurisdiction to the United States.

But it is claimed that the appellee violated the election act of 1897, by enumerating the inmates of the home as electors, in making the apportionment of election precincts. In ruling upon this motion it is immaterial whether they were or were not legal voters in the precincts when this action was brought. The question we are here called upon to determine is: Are they now, by virtue of the subsequent retrocession of state jurisdiction, over the territory upon which the institution rests, legal voters, if possessed of the necessary age and residence qualifications?

"Every male citizen of the United States, of the age of twenty-one years and upward, who shall have resided within the State during the six months, and in the township sixty days, and in the ward or precinct thirty days, immediately preceding the election" is a qualified voter in this State. Art. 2, §2, Constitution. We know of no law in this State that denies the right of suffrage to poor persons, or to those who are maintained at public expense.

Appellant argues, through pages of brief, that the inmates of the home, being indigent ex-soldiers collected from all parts of the country, and being maintained at an eleemosynary institution at public expense, can neither gain nor lose a residence by sojourning at the home, within the meaning of

article 2, §2 of our State Constitution; and many cases based upon the status of occupants of poorhouses, hospitals, and asylums are cited in support of the contention. But we can not accept these as in point. The case we have here does not present an almshouse question. The National Government does not keep poorhouses for those of its defenders who become maimed and invalided in its service. The maintenance of a volunteer who becomes indigent from a disability incurred in the service is no more a charity than a pension is a benevolence; both are considerations for services rendered the Government, and both are implied from long usage of the Government, and rightfully operate as an inducement to the volunteer to enter the military service.

A different rule must be applied to the inmate of a National Home for Disabled Volunteer Soldiers. He goes to the home because he has a right to go; a right springing, by implication, from the conduct of the Government he has served. He goes voluntarily, and departs at his pleasure; and the fact that while he remains he is required to submit to the rules and articles of war, or any other means or measure of discipline, makes no difference. He is at no time under any degree of coercion to enter or remain. Hence the question of his residence therein is a matter of his free choice, to be tested by the same rules applicable to other citizens. But the pauper is under a species of confinement. In this State, if a chronic invalid, he is not allowed public aid outside the poorhouse, and is conveyed from the place of his residence to another abode and kept there, in theory at least, against his will; and will and intention are the very essence of domicile or residence within the meaning of our election laws.

But even as to inmates of poorhouses, asylums, and the like, the rule is not as narrow as stated by appellant. Every man has a legal residence somewhere, and it may exist in any sort of place, if the will and intention to remain indefinitely concur. McCrary on Election, (4th ed.) §§102, 104; *Stewart* v. *Kyser*, 105 Cal. 459; *Sturgeon* v. *Korte*, 34 Ohio St.

525; *Le Moyne* v. *Farwell*, Smith Digest E. Cases, 406. We do not hold that all inmates and officers of the home are legal voters, or that any one of them is, but we do hold that their qualification as electors is to be determined by the same rules applicable to other citizens of the State, and that they are not to be discredited, nor their right to vote impaired, by the fact that they are being supported at public expense; and that since the congressional act of July 7, 1898, they should be enumerated as other citizens of Center township in the formation of election precincts.

We conclude, therefore, that the act of Congress of July 7, 1898, restoring the jurisdiction of the State over the 304 acres of territory in question and fully relinquishing all jurisdiction of the United States over the place, subsequent to the commencement of this suit, has removed the question involved in this appeal from actual controversy, and created a state of facts that will preclude the carrying into effect of any judgment that may be rendered upon appellant's petition.

We can not, under the law as well settled, give time to the examination of moot questions, the determination of which will serve no useful purpose. *Manlove* v. *State, ante,* 80; *Stauffer* v. *Salimonie, etc., Co.,* 147 Ind. 71; *Wallace* v. *City of Indianapolis,* 40 Ind. 287, 289; *Mills* v. *Green,* 159 U. S. 651, 16 Sup. Ct. 132; *Gloucester City* v. *Greene,* 45 N. J. Eq. 747, 754, 18 Atl. 81; *People* v. *Troy,* 82 N. Y. 575; *Matter of Manning,* 139 N. Y. 446, 448, 34 N. E. 931; *Cantwell* v. *Williams,* 35 S. C. 602, 14 S. E. 549; *State* v. *Waggoner,* 88 Tenn. 290, 12 S. W. 721; *Foster* v. *Smith,* 115 Cal. 611, 47 Pac. 591.

Appeal dismissed.