Ragsdale v. Dyer.

## S. G. RAGSDALE v. ART J. DYER.*

### (*Nashville.* December Term, 1924.)

1. **CONTRACTS.** Variance between allegation of absolute agreement and proof of contingent or conditional agreement is fatal.

   Where pleading alleges absolute promise or agreement, and proof shows one that was contingent or conditional, the variance is fatal. (*Post, p. 507.*)

   Case cited and approved: Bank v. Swepson, 69 Tenn., 355.

2. **APPEAL AND ERROR.** Question of variance cannot be first raised in appellate court.

   Question of variance cannot be raised for first time in appellate court. (*Post, pp. 507-509.*)

   Case cited and approved: Tyng Commercial Warehouse Co., 58 N. Y., 308.

   Case cited and distinguished: Wasatch Mining Co. v. Crescent Mining Co., 148 U. S., 293.

3. **APPEAL AND ERROR.** Question of repugnancy between contract set out and allegations cannot be raised for first time on appeal.

   Repugnancy between conditional written contract, set out *in haec verba,* and allegation that unconditional contract was made, is not available where objection is made for the first time on appeal. (*Post, pp. 510-513.*)

   Cases cited and approved: Tenn. Ice Co. v. Raine, 107 Tenn., 151; Dillard & Coffin Co. v. Smith, 105 Tenn., 372; American Freehold Land Mortgage Co. v. Sewell, 92 Ala., 163; Wasatch Mining Co. v. Crescent Mining Co., 148 U. S., 293; Bannon v. Jackson, 121 Tenn., 381.

Ragsdale v. Dyer.

Cases cited and distinguished: Railroad v. Central Lumber Co., 95 Tenn., 538; Martinsburg & Potomac R. R. Co. v. March, 114 U. S., 549.

4. **SALES.** Contract for sale of equipment "suitable for use" in construction of electric power line required merely reasonable fitness.

Contract of sale of insulators, poles, and other equipment, for use in construction of electric power line, requiring such equipment to be "suitable for use" in such line, and "acceptable for that purpose" to power company, required merely equipment acceptable or satisfactory to a reasonable man. (*Post, pp.* 513, 514.)

Case cited and distinguished: Robeson & Weaver v. Ramsey, 147 Tenn., 25.

5. **SALES.** Compliance with provision requiring power company's approval of equipment purchased for power line could be waived.

Compliance with provision in contract of sale of insulators, poles, and similar equipment, for use in construction of electric power line, that such equipment be "acceptable for that purpose" to power company, could be waived. (*Post, pp.* 514-519.)

Cases cited and approved: Bannon v. Jackson, 121 Tenn., 381;. Summerlin v. Thompson, 31 Fla., 369; Healy v. Fallon, 69 Conn., 228; Lindblom v. Mayar, 81 Wash., 350; Pinches v. Swedish Lutheran Church, 55 Conn., 183.

Cases cited and distinguished: Healy v. Fallon, 69 Conn., 228; Summerlin v. Thompson & Co., 31 Fla., 369; Lindblom v. Mayar, 81 Wash., 350.

6. **SALES.** Defense that power company had not approved equipment as required by contract of sale held waived in action for price.

In action for price of insulators sold for use in construction of electric power line, sold under contract requiring power company's approval, in which defendant filed cross-bill on theory that insulators were unfit, and had for that reason been properly rejected by power company, and the case was submitted on the merits, defendant waived the defense that power company's nonapproval defeated recovery. (*Post, pp.* 519, 520.)

150 Tenn.—32.

Ragsdale v. Dyer.

7. **SALES.** Finding for plaintiff on issue of suitability of insulators sold not against preponderance of evidence.

In action for price of insulators sold for use in construction of proposed electric transmission line, finding for plaintiff on issue whether the insulators were suitable for such a line as was contemplated when sale was made *held* not against preponderance of the evidence. (*Post, pp.* 520-524.)

8. **SALES.** Evidence held to sustain allowance to seller under contract entitling him to reasonable price.

In action for price of insulators, poles, and other equipment, sold for use in construction of electric power line under contract providing for payment of "reasonable prices," evidence *held* to sustain amount allowed seller. (*Post, p.* 524.)

---

*Headnotes 1. Contracts, 13 C. J., section 907; 2. Appeal and Error, 3 C. J., section 720; 3. Appeal and Error, 3 C. J., section 706; 4. Sales, 35 Cyc, p. 220; Contracts, 13 C. J., sections 768, 769; 5. Building and Construction Contracts, 9 C. J., section 99; Sales, 35 Cyc, p. 239 (1926 Anno); 6. Sales, 35 Cyc, p. 239 (1926 Anno); 7. Sales, 35 Cyc, p. 233; 8. Sales, 35 Cyc, p. 571.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County. —Hon. James B. Newman, Judge.

Norman Farrell and Thos. G. Kittrell, for appellant.

Vertrees & Vertrees, for appellee.

Mr. Malone, Special Judge, delivered the opinion of the Court.

This is a bill to recover the sum of $4,000, alleged to be the balance due and unpaid on account of the sale of

certain insulators, poles, and other equipment, made by complainant, Ragsdale, to defendant, Dyer, for use in the construction of an electric power line from Lebanon, Tenn., to Murfreesboro, Tenn.

The chancellor gave a decree for complainant for the items sued for, with two exceptions, which are not now in question.

From this decree defendant, Dyer, has appealed, and his assignments of error in this court may be grouped under two general contentions:

(a) That the materials in question (certain insulators) were to be approved by the Tennessee Power Company, and the bill fails to allege that such approval was given, or that failure to approve was due to fraud or collision.

(b) That the insulators in question were of an obsolete type, and were properly rejected by the Tennessee Power Company, and were, moreover, deficient and unfit for the purposes for which they were sold under the contract.

In answer to this, the appellee, Ragsdale, contends:

(a) That there was a waiver on the part of the defendant, Dyer, of the provision as to approval.

(b) That the insulators were never tested at the voltage contemplated by the contract, but at a different and much higher voltage,

(c) That the insulators were, in fact, fit for the purposes for which they were sold under the contract.

With this outline of the contentions advanced by the respective parties, we proceed to state the facts disclosed by the record.

On February 7, 1919, Ragsdale made a contract with the city of Lebanon to construct and finish, at his own expense, an electric power line from Murfreesboro, Tenn., to Lebanon, Tenn.

Articles 1 and 2 of this contract read as follows:

"1.  The contractor hereby binds and obligates himself to erect, construct, and completely finish, at his own expense, a line for the transmission of electricity from Murfreesboro, Tennessee, to Lebanon, Tennessee, of the following quality, character, and description: (a)  A line consisting of three wires of the capacity, in all, of five hundred kilowatts at thirty-three thousand volts, sixty cycles, three phase, with all appliances required to make a complete installation; (b) to be of good material, finished and built in a workmanlike manner, and to be what is known as a 'turn-key job' without charge for any 'extras' and of such a character as to merit, and which shall meet, the approval of the Tennessee Power Company; and

"2.  This shall, and does, include three one hundred and fifty kilowatt, thirty-three thousand volt step transformers, to be located at the station at Murfreesboro, Rutherford county, Tennessee, and also three other step transformers of like description, quality and character, to be located at the station in Lebanon, Wilson county, Tennessee, with all connections and appliances requisite and necessary to make a complete installation—all to be furnished, placed, and established at the cost of the contractor and to be of the same good quality and description in all respects as the line mentioned in article No. 1 hereof.''

The defendant, Dyer, and others had procured a charter under the laws of Delaware for a corporation called the Cumberland Power Company. No stock had been issued in this company, and on the payment of the organization fees the promoters turned over the corporation to Ragsdale.

On June 7, 1919, complainant, Ragsdale, sold and assigned to said corporation all of his rights, under his contract with Lebanon, dated February 7, 1919, and the Cumberland Power Company assumed all his duties and obligations under said contract.

Thereafter, under date of September 21, 1919, Ragsdale and the Cumberland Power Company and the defendant, Dyer, entered into the contract out of which the present suit arises. This contract reads as follows:

"This agreement, entered into this the 21st day of September, 1919, by and between the Cumberland Power Company, a corporation chartered under the laws of Delaware and having an office in Lebanon, Wilson county, Tennessee, and S. G. Ragsdale, of Lebanon, Tennessee, parties of the first part, and Art J. Dyer, party of the second part, witnesseth:

"Whereas, on the 7th day of February, 1919, the said S. G. Ragsdale entered into a written agreement with the commissioners of Lebanon, Tennessee, wherein the said Ragsdale obligated himself to erect and completely install ready for operation an electric transmission line extending along the turnpike from the town of Murfreesboro, Tennessee, to said town of Lebanon, and said line to be connected with the Tennessee Power Company's power station at Murfreesboro and with the power station of said town of Lebanon, at Lebanon, and for a

certain consideration to lease said line upon its completion to the town of Lebanon for a term of years with the option in Lebanon to purchase said line after a certain period for a consideration and on terms therein set forth; and

"Whereas, on the 17th day of June, 1919, said Ragsdale assigned and transferred all his rights and interests in said contract to the said Cumberland Power Company; and

"Whereas, after the said assignment and transfer the said Ragsdale purchased certain material, equipment, and fixtures, consisting of tools, poles, insulators and other articles to be used in the erection of said transmission line; and

"Whereas the first parties desire to surrender all their rights and interests and to be relieved of their obligations under said contract, and the said Ragsdale desires to sell and dispose of the above-mentioned material, equipment, and fixtures; and the third party desires to enter into a contract with Lebanon to erect said transmission line, similar to the aforesaid contract between said Lebanon and said Ragsdale:

· "Now, therefore, in consideration of the mutual covenants and promises herein contained, it is agreed as follows: (1) The said Ragsdale agrees to sell to the said Dyer, and the said Dyer agrees to purchase at reasonable prices, such of the aforesaid material, equipment, and fixtures consisting of tools, poles, insulators, and other articles heretofore purchased by the said Ragsdale, as are suitable for use by the said Dyer in the erection and installation of the aforesaid proposed transmission line, and acceptable for that purpose to the Tennessee Power

Ragsdale v. Dyer.

Company. (2) The first parties agree to surrender to Lebanon, Tennessee, all their rights and interests in the aforesaid contract entered into between Lebanon and Ragsdale for the erection of said transmission line. (3) The said Dyer agrees to secure from Lebanon a release for the first parties hereto from their obligations under the said contract entered into between Ragsdale and Lebanon. (4) Said Ragsdale agrees to transfer to the said Dyer the rights of way held by him over the turnpikes and county roads between Murfreesboro and Lebanon.

"In witness whereof, the parties have hereunto signed their names in duplicate original the day and year first above written.

"CUMBERLAND POWER COMPANY,

"By J. T. ODUM, President.

"Attest: L. K. Odum, Secretary.

"S. G. RAGSDALE.

"ART J. DYER."

As will be observed, by the terms of this contract, it was provided:

(a) That Dyer agreed to purchase "at reasonable prices," such portion of this material as might be "suitable for use by the said Dyer in the erection and installation of the aforesaid proposed transmission line and acceptable for that purpose to the Tennessee Power Company."

(b) That Ragsdale and the Cumberland Power Company agreed to surrender to Dyer all rights under the contract with Lebanon.

(c) . That Dyer agreed to secure from Lebanon a release of Ragsdale and the Cumberland Power Company from these obligations.

(d)   That Ragsdale agreed to transfer to Dyer the rights of way which he held over certain turnpikes and roads between Murfreesboro and Lebanon.

On the next day, September 22, 1919, Dyer entered into a contract with the city of Lebanon for the erection of a power line between Lebanon and Murfreesboro.

As pointed out in the brief of appellee, this contract differed in several particulars from the contract of February 7, 1919, which Ragsdale had made with the city of Lebanon.

After reciting that Lebanon ''has arranged with the Tennessee Power Company for electric current to be received by connecting with its lines at Murfreesboro, Tennessee, so as to transmit the current to Lebanon, Tennessee, by means of a transmitting line,'' Dyer's contract proceeds as follows:

''1.   The contractor hereby binds and obligates himself to erect, construct, and completely finish, at his own expense, a line for the transmission of electricity from Murfreesboro, Tennessee, to Lebanon, Tennessee, of the following quality, character, and description: (a) A line consisting of three wires of the capacity, in all, of five hundred kilowatts at suitable and not less than 33 M voltage, sixty cycles, three phases, with all appliances required to make a complete installation; (b) to be good material, finished and built in a workmanlike manner, and to be what is known as a 'turn-key job,' without charge for any 'extras,' and of such a character as to

Ragsdale v. Dyer.

merit and which shall meet the approval of the Tennessee Power Company, and

"2.    This shall and does include suitable transformers to be located at the station at Murfreesboro, Rutherford county, Tennessee, and also suitable transformers to be located at the station in Lebanon, Wilson county, Tennessee, with all connections and appliances requisite and necessary to make a complete installation,—all to be furnished, placed, and established. at the cost of the contractor and to be of the same good quality and description in all respects as the line mentioned in article 1 hereof; but the three step-down transformers at Lebanon shall be located and installed outside of the power house of Lebanon."

It will be noted:

(a)    That Ragsdale's contract of February 7. 1919, provided for a voltage "at 33 M volts," whereas, Dyer's contract of September 22, 1919, provides for a capacity of "not less than 33 M voltage."

(b)    Ragsdale's contract of February 7th provided for six 33 M volt step transformers; whereas, Dyer's contract of September 22d merely provided for "suitable transformers"—three at Lebanon, etc.

By comparison of other portions of the two contracts, it will be noted that a further difference exists in this respect:-

(c)    Ragsdale's contract with Lebanon gave him the right to connect with the line for the purpose of supplying "other municipalities or towns, or manufacturing plants in Middle Tennessee with electric current of the Tennessee Power Company;" but this privilege was not to be "exercised by the contractor in respect to any other

municipalities than Watertown and Alexandria or to any manufacturing plants than those in or within a radius of five miles of said two towns.''

Whereas Dyer's contract with Lebanon gave him the right ''to connect with the above-mentioned line at any point or points so as hereby to obtain, receive, and supply other municipalities or towns, manufacturing plants in Middle Tennessee, outside of a radius of five miles from the corporate limits of Lebanon.''

In other words, Ragsdale's contract was far more limited as to ''tapping rights'' than was Dyer's contract.

Ragsdale was employed by Dyer to superintend the construction of the line, and, proceeding under the contract of September 22, 1919, did construct it, using the material purchased by Dyer, under the contract, including certain insulators.

These insulators had been originally purchased by Ragsdale to enable him to comply with his contract with Lebanon. They were secondhand insulators, and had been in actual use in a seventy-mile electric line in Lima, Ohio, and had proven satisfactory with a current of 33 M volts. In installing these insulators, Dyer used an iron pin on the top of the pole to fasten the insulator to the pole, and wooden pins on the two insulators attached to the cross-arms. Dyer did not install any step transformers as called for by his contract, or by Ragsdale's contract with Lebanon.

After the line was completed, the Tennessee Power Company, in November, 1919, and thereafter, undertook to test it. In making this test, a current of 44 M volts was used. This was the ordinary current of the Tennessee Power Company. The effect of passing this

Ragsdale v. Dyer.

current over the line was that fourteen or fifteen of the insulators (all of which were fastened with iron pins on top of the poles) were destroyed. This happened at different places along the line. None of the insulators attached to the cross-arms, where wooden pins were used, were blown out.

· The line was then tested by the Tennessee Power Company's engineer at 37 M volts, and also at 22 M volts.

No test was made at 33 M volts, as no step transformers had been erected to give a current of 33 M volts.

The Tennessee Power Company notified Dyer that it would not approve the line as a 33 M volt line. Dyer thereupon refused to pay Ragsdale for the insulators, and the present suit followed.

1. The appellant, Dyer, insists that there is a variance between the written contract and the contract sued on in the bill, in this:

It is claimed that the written contract is conditional— the approval of the Tennessee Power Company being necessary to the validity of the sale—whereas, the contract sought to be established by the proof, in accordance with certain averments of the bill, is an absolute or unconditional contract.

It is doubtless true, as appellant insists, that, where the pleading alleges an absolute promise or agreement, and the proof shows one that was contingent or conditional, the variance is fatal. 22 Ency. Pl. & Pr. 572; *Bank* v. *Swepson* (1878), 1 Lea, 355, 357.

But it is equally well settled that the question of variance cannot be raised for the first time in the appellate court.

In the case of *Wasatch Mining Co.* v. *Crescent Mining Co.* (1892), 148 U. S., 293, at page 297, 13 S. Ct., 600, 601 (37 L. Ed., 454), the appellant insisted on "what he contends is a fatal variance between the allegations of the bill of complaint and the findings of fact on which the court below based its judgment."

After alleging that by reason of certain facts stated there was a fulfillment of the contract, in a modified form, the court continues:

"And the assignment of error resolves itself into a contention that the bill of complaint did not, in terms, allege the modification of the agreement in the particulars mentioned, and did not aver a waiver of the condition that the deed was not to be delivered until the pending suit with third parties should be determined, and that therefore the case made and found was different from the one alleged."

Remarking that this objection "came too late," the court continues:

"In the district court the defendant did not demur to the complaint as asking a form of relief inconsistent with the terms of the contract alleged, but by an answer and cross-bill brought all the facts before the court; nor did the defendant object to plaintiff's evidence as exhibiting a different case from that asserted in the bill.

"The supreme court of the territory rightfully held that the defendant should have raised the question in the trial court, where ample power exists to correct and amend the pleadings; and, not having done so, but having gone to trial on the merits, the defendant was precluded from assigning error for matters so waived.

Ragsdale v. Dyer.

"The doctrine on this subject is well expressed in the case of *Tyng* v. *Commercial Warehouse Co.*, 58 N. Y., 308, 313: 'No question appears to have been made during the trial in respect to the production of evidence founded on any notion of variance or insufficiency of allegation on the part of plaintiff. Had any such objection been made it might have been obviated by amendment in some form or upon some terms under the ample powers of amendment conferred by the Code of Procedure. It would therefore be highly unjust, as well as unsupported by authority, to shut out from consideration the case as proved, by reason of defects in the statements of the complainant. Indeed, it is difficult to conceive of a case in which, after a trial and decision of the controversy, as appearing on the proofs, when no question has been made during the trial in respect to their relevancy under the pleadings, it would be the duty of a court, or within its rightful authority, to deprive the party of his recovery on the ground of incompleteness or imperfection of the pleadings.' "

In the present case, there was no demurrer or other pleading raising this point.

Defendant objected below to certain evidence offered by complainant, on the ground that this evidence sought to vary or contradict the terms of the written contract. These objections were sustained by the chancellor, and the evidence excluded. There was no motion to strike out any, or all, of the defendant's evidence, on the theory of variance.

We are therefore of opinion that the point now made by appellant cannot be sustained.

2. In the same connection it is insisted that the bill contains repugnant allegations, in that it sets out *in hæc verba* a conditional written contract, and at the same time alleges that an unconditional contract was made.

No such contention was made in the defendant's pleading below.

It may well be that the defense of repugnancy could only be made by demurrer. *Tenn. Ice Co.* v. *Raine,* 107 Tenn., 151, 155, 64 S. W., 29; *Dillard & Coffin Co.* v. *Smith* (1900), 105 Tenn., 372, 382, 59 S. W., 1010; *American Freehold Land Mortgage Co.* v. *Sewell* (1890), 92 Ala., 163, 173, 9 So., 143, 13 L. R. A., 299; 18 Ency. Pl. & Pr., 743. And see *Wasatch Mining Co.* v. *Crescent Mining Co.* (1892), 148 U. S., 293, 299, 13 S. Ct., 600, 37 L. Ed., 454.

But, in any event, the objection must be made in the court below. Authorities above cited.

We therefore hold that the appellant's objection on the ground of repugnancy comes too late.

3. It is earnestly insisted, on behalf of appellant, that the chancellor's decree should be reversed, because the complainant's bill does not show that the material was acceptable to, or approved by, the Tennessee Power Company, nor does it charge that the company's failure to approve was fraudulent, or by collusion with the defendant, Dyer.

Our own cases of *Bannon* v. *Jackson* (1908), 121 Tenn., 381, 117 S. W., 504, 130 Am. St. Rep., 778, 17 Ann. Cas., 77; *Railroad* v. *Central Lumber Co.* (1895), 95 Tenn., 538, 32 S. W., 635, and numerous authorities from other jurisdictions, are cited in support of this contention.

The case of *Bannon* v. *Jackson,* supra, decided the point that, where the contract called for an architect's certificate on the question of extra work, it was a condition precedent to the maintenance of a suit by the contractor against the owner that he should allege and prove either (a) that such certificate was given, or (b) that refusal to give the same was fraudulent, malicious, or unreasonable, or (c) that there was a waiver of the condition.

See 121 Tenn., pp. 395, 396 (117 S. W., 504) approving 30 A. & E. Ency. of Law, 1239, 6 Cyc., p. 88.

The case of *Railroad* v. *Central Lumber Co.,* supra, involved a building contract, which contained the stipulation that the chief engineer of the railroad company should have absolute right and authority to fix and determine the amount of the allowance (if any) to be made for extras claimed by the contractor. The railroad company relied upon the engineer's estimate, as final and conclusive, and this contention was sustained, the court saying, at page 543 (32 S. W., 636):

"The rule is well settled that where parties to a construction contract of any kind agree to submit differences, or questions of any character arising in connection with the work, to the decision of an architect or of an engineer, the decision of the arbiter thus selected is final, and all parties are bound by it unless it be shown that the estimate or conclusion is fraudulent or so excessive or so palpably unjust as to imply bad faith or gross neglect."

It was also said, at page 545 (32 S. W., 637):

"In this case there is no charge of fraud, and no attack upon the good faith or fairness of the engineer in

the pleadings, and even the proof does no more than raise a question as to which there may be honest difference of opinion, but as to which the facts of the record appear to sustain the engineer. It seems to be precisely one of those matters which the parties must have had in mind when they agreed that the engineer should pass upon the questions relating to extra work.''

The case of *Martinsburg & Potomac R. R. Co.* v. *March* (1884), 114 U. S., 540, 5 S. Ct., 1035, 29 L. Ed., 255, also cited by appellant, was a case of the same nature; the contract providing that the estimate of the company's engineer should be final and conclusive. It was held that, so long as the officer exercised an honest judgment in making his inspections, and so long as there was neither, on his part, fraud nor such gross mistake as implied bad faith, the contractor had no cause of action under the contract.

The court says, at page 553 (5 S. Ct. 1037):

''Nor does the declaration state any facts entitling him to sue the company, on the contract, in the absence of such a certificate by the engineer, whose determination was made by the parties final or conclusive. And upon the supposition that the engineer made such a certificate as that provided by the contract, there is no allegation that entitled the plaintiff to go behind it; for there is no averment that the engineer had been guilty of fraud, or had made such gross mistake in his estimates as necessarily implied bad faith, or had failed to exercise an honest judgment in discharging the duty imposed upon him. The first count of the declaration was therefore defective for the want of proper averments showing plaintiff's right to sue on the contract, and the demurrer to that count should have been sustained.''

Ragsdale v. Dyer.

(a)   It is apparent that these cases are all concerned with a particular class of contracts, namely, building contracts, and with the troublesome question of "extra work" which so often arises in the course of their performance.

Nice questions concerning the construction to be given the contract, in connection with the plans and specifications, are almost sure to present themselves, and, to prevent the disputes and disagreements which would inevitably follow, the parties agree that the decision of a particular person (usually the architect) shall be final and conclusive, and that payments shall be made only on his certificate.

It is evident that these cases, on their facts, differ widely from the instant case, where there was a sale of materials to be used in the construction of an electric railroad, and the contract provides that such materials shall be "suitable for use" in said line, and "acceptable for that purpose" to a company which is to furnish the power for the proposed line.

It could hardly be contended that in such a case anything more than reasonable fitness was in the contemplation of the parties.   The proper test here seems to be whether the materials would be acceptable or satisfactory "to a reasonable man."   *Robeson & Weaver* v. *Ramsey* (1922), 147 Tenn., 25, 30-32, 245 S. W., 413.

It was there said (page 31 [245 S. W., 415]), with respect to a contract providing that the price bid at a particular sale must be "satisfactory" to the owners:

"The cases involving the construction of the word 'satisfactory' are too numerous and too conflicting to be reviewed here.   They will be found collected in 13 C. J.,

150 Tenn.—33.

675 et seq.; 6 R. C. L., 952 et seq.; Elliott on Contracts, section 1603.

"It seems from these authorities that, where the contract involves the feelings, taste, or sensibilities, as a costume or a painting, it is ordinarily held that the buyer has an absolute right to determine for himself whether the article furnished or work done is satisfactory.

"Where the contract involves operative fitness or mechanical utility, as the character of machinery sold or installed, the decisions are more conflicting; many holding performance sufficient if it reasonably ought to satisfy, or should be satisfactory to a reasonable man."

It was accordingly decided that a price, substantially in excess of the market price, must be held "satisfactory," because the owners, as reasonable men, should have been satisfied.

(b)   But even if it be conceded that the present case falls within *Barron* v. *Jackson,* and that line of cases wherein the contract calls for, and makes conclusive, an architect's certificate, yet the binding provision contained in such a contract may be waived. *Bannon* v. *Jackson* (1908), 121 Tenn., 381, 395, 396, 117 S. W., 504, 130 Am. St. Rep., 778, 17 Ann. Cas. 77; 9 C. J., 761; 4 Elliott on Contracts, section 3732, section 3730; 6 Cyc., 88; *Summerlin* v. *Thompson.*(1893), 31 Fla., 369, 384, 12 So., 667; *Healy* v. *Fallon* (1897), 69 Conn., 228, 234, 235, 37 A., 495; *Lindblom* v. *Mayar* (1914), 81 Wash., 350, 142 P., 695, 697.

In the present case, the defendant, Dyer, did not demur to the bill on the ground that it failed to show approval on the part of the Tennessee Power Company, or facts excusing the failure to approve.

Ragsdale v. Dyer.

Neither was such a specific defense made in the answer. The appellant Dyer relies on the following statement, in his answer:

"Defendant avers that the said insulators have been thoroughly tested in the operation of said line by competent and disinterested experts, according to methods approved by the present state of the art continuously since said 11th day of November, 1920, *and said tests have shown that said insulators are wholly unsuitable for use in a line transmitting a current of 33,000 volts,* or any current of greater intensity than 11,000 volts, and are *wholly unsuitable for use in the line provided for in the contract* between the parties of September 21, 1919, and were so unsuitable at the time of the execution of said contract. *Said Tennessee Power Company has expressly disapproved said insulators for the transmission of a current of 33,000 volts,* or for the transmission of any current of greater intensity than 22,000 volts."

As will be noted, the statement as to disapproval occurs in connection with the contention that the insulators were, in fact, found unsuitable, after proper test.

Nowhere in the answer does the defendant sharply make the contention, now presented, that the decision of the Tennessee Power Company is conclusive, irrespective of the merits of the controversy.

(c) But apart from this the appellant, Dyer, filed a cross-bill, in which he insisted, at great length, that the insulators were, in fact, defective, and that they were properly rejected by the Tennessee Power Company, on account of these defects, and asked damages because he had to replace them with others at an expense of $6,000. The tests made by the Tennessee Power Company are

stated in detail, in the cross-bill, and it is there insisted that the Power Company properly rejected the insulators because they were unfit; but it is nowhere suggested that the decision of the Power Company was binding, whether right or wrong, and that its approval was a condition precedent to a recovery.

The complainant answered this cross-bill, insisting that the tests given by the Tennessee Power Company were for the purpose of ascertaining whether the line would carry a current of 44,000 volts, and that no test of the line was ever made to ascertain whether it would carry a current of 33,000 volts, as called for in Ragsdole's contract, and in Dyer's contract, with Lebanon.

The case below was tried on its merits, the issue being whether the insulators were, in fact, fit for the purpose for which they were sold under the contract, and whether the Tennessee Power Company's failure to accept the same was proper.

In the case of *Healy* v. *Fallon* (1897), 69 Conn., 228, at pages 234, 235, 37 A. 495, 497 (a case involving an architect's certificate), it was said:

"If we concede for the sake of the argument that the the provisions of the contract above referred to have all the force and effect claimed for them by the defendants, still they are provisions made in favor of the defendants, and may be waived or abandoned by them at any time, and we are of opinion that the defendants have waived and abandoned them in the case at bar. *By the pleadings in this case both parties, in effect, asked the court below to determine the very questions which the defendants now claim can be determined only by the architects.* The defendants, instead of setting up and in-

sisting upon the provisions in question in bar of the claims of the plaintiff, asked the court, in effect, by their pleadings, to try the question whether the plaintiff had performed his contract, and if not, whether anything, and if so, what amount, was due to him. This is the fair interpretation to be put upon the pleadings and upon the issues formed by them. Under these pleadings both parties went to trial and were fully heard as to all matters covered by the issues, and took their chances as to the result. Under the pleadings the court properly found that the plaintiff had substantially performed his contract, that the deviations from it were unintentional and slight, and that the defendants had accepted and were in the enjoyment of the results of the work done and materials furnished by the plaintiff. Under these circumstances the court was justified in applying the rule sanctioned and approved by this court in *Pinches* v. *Swedish Lutheran Church,* 55 Conn., 183. By thus pleading and going to trial the defendants must be held to have waived or abandoned the provisions of the contract in their favor upon which they now rely.''

In the case of *Summerlin* v. *Thompson & Company* (1893), 31 Fla., 369, 12 So., 667, the building contract in question contained a stipulation that the judgment of the architect should be final as to disputes arising, etc.

Affirming a judgment for plaintiff, the court said, at page 382 (12 So., 671):

''The third plea sets up, among other things, that by the terms of the contract under which the building was erected it was agreed that G. A. Hanson on behalf of the defendants should constitute the building committee, and if he and plaintiffs should disagree as to the quality

of material or the proper construction of any part of said building, then the architect should decide the issue, and then alleges that plaintiffs, upon notification that part of the material and workmanship on the building was unsatisfactory, refused to correct the same, or submit to the decision of the architect, as they were bound to do under the contract. While this plea alleges that the contract provides for the adjustment, by the decision of the architect, of disputed points between the parties, *this is not set up in abatement of plaintiffs' right to proceed without first obtaining the decision of the architect* as to the amount due. It is alleged to be a plea "by way of cross-action," and avers that the plaintiffs were indebted to defendants at the time of the commencement of the suits, and claims judgment for $5,000. Disregarding the form of the plea, and considering it as an entirety, it seems to be one in the nature of recoupment for damages by reason of a failure on the part of plaintiffs to comply with the contract. After alleging the various matters therein contained as defaults on the part of plaintiffs, it concludes with an averment that defendants are 'damaged in the sum of $5,000, for which they claim judgment in their cross-action over and above any sum claimed by plaintiffs, and for costs and attorney fee of $300 herein expended.' Instead of relying upon the authority, under the contract, of the architect to decide upon questions of disagreement as an abatement of the action, this defense seems to be waived by the plea, and a failure of plaintiffs to submit to the decision of the architect is set up as one of the causes of damages for which judgment is demanded in favor of defendants in what is called their cross-action. So far, then, as the pleas are concerned, they do not

present as a defense to the right of plaintiffs to maintain their suit the method of adjustment by the architect, *but the issues which they do present involve a consideration before the jury of the entire merits of the controversy between the parties.*''

The appellant relies on the case of *Lindblom* v. *Mayar* (1914), 81 Wash., 350, 142 P., 695, and insists that this case lays down a different rule.

In that case, the defendant, in his answer, set up the contract, showing the provision as to the architect's certificate, and alleged:

''That the said building has never been completed, and has never been accepted according to the contract.''

The respondent also claimed damages, resulting from the defective construction of the building. The court says (81 Wash., 356) at pages 696, 697:

''These allegations of damage are not inconsistent with the allegation of failure of acceptance according to the terms of the contract, nor did respondents offer any evidence upon the trial in support of these allegations. Had they done so, *and thus submitted to the court the entire controversy between themselves and appellant upon the merits,* it might well be said that they thereby waived their right to the architect's certificate as a condition precedent to appellant's right to recover upon the merits.''

In the present case, the whole controversy was submitted on its merits, under the pleadings, and under the proof, and was decided on its merits by the chancellor. Moreover, the defendant filed a cross-bill, seeking damages on the theory that the insulators were unfit and

unsuitable, and had, for that reason, been properly rejected by the Tennessee Power Company.

We think, both on principle and on authority that the appellant, Dyer, has waived the strict and sharp defense on which he now insists, and cannot be heard in this court to say that the case should be decided apart from its merits.

4. Coming now to the merits of the controversy, several contentions are advanced by the appellant.

(a) It is insisted that the insulators were of an obsolete type, defective, and wholly unfit for use, even in a line with a maximum current of 33,000 volts. It is said that the tests made by the Tennessee Power Company conclusively demonstrated a leakage in the line, which increased as more current was applied, and that the insulators were unfit for use with current stronger than 22,000 volts, and were properly rejected by the Tennessee Power Company.

In dealing with this contention, we must bear in mind the provisions of Ragsdale's contract with Lebanon, and of Dyer's subsequent contract with the same municipality. We have heretofore shown by an analysis of these contracts that there was a material difference in several important particulars.

Ragsdale's contract provided for a current ''at 33,000 volts,'' whereas Dyer's contract provides for a capacity of ''not less than 33,000 voltage.''

Again, Ragsdale's contract provided for six 33,000 volt step transformers to transform the normal current of 44,000 volts, whereas, Dyer's contract merely called for ''suitable'' transformers—three at Lebanon.

Again, Ragsdale's contract gave him a right to supply current to other towns, or plants in Watertown or Alex-

andria, or within a radius of five miles, a comparatively small area, whereas, Dyer's contract gave him the right to supply current anywhere in Middle Tennessee outside of a five-mile circle around Lebanon.

It is obvious that Dyer's contract was not "similar" to Ragsdale's contract in these respects, and that it contemplated a line with a much more powerful current than the line contemplated by Ragsdale's contract.

The record shows that the transformer at Murfreesboro was destroyed, after Ragsdale's contract was made, and before Dyer's contract, and that Murfreesboro was therefore using the 44,000 direct current of the Tennessee Power Company. It is evident that Dyer conceived the idea of using this 44,000 volt current on the line constructed under his contract, thereby avoiding the expense of erecting the step transformers called for by his contract. By such omission he would save a very considerable amount. Ragsdale estimates that these transformers would have cost from $12,000 to $15,000. Dyer's proof shows that the cost of one transformer would have been nearly $3,500 in the year 1920, f. o. b. factory in Massachusetts. His contract called for three at Lebanon, and for "suitable transformers' at Murfreesboro; no number being specified.

But we are not left to conjecture with respect to Dyer's intention. He testified as follows:

"Q. What kind of a line were you contemplating for Lebanon at that time?

"A. We contemplated building a similar line to his, with a potential of 44,000 volts.

"Q. Then, when you constructed it, you constructed it with that view, did you not, 44,000 potential?

"A.  Yes, sir.

"Q.  And that is the one you wanted them to accept when the tests were made?

"A.  Yes, sir."

The general superintendent of the Tennessee Power Company wrote Mr. Dyer a letter, in which the following language is found:

"The insulators which you propose using in this line are designed for a maximum of 33,000 volts, but by using them on wooden poles and wooden cross-arms, which will be free of ground connections, it is hoped that the equipment will operate satisfactorily at 44,000 volts, and the Power Company is entirely agreeable to try out this scheme of operation preparatory to installing a higher voltage insulator later on if it is proven that the present equipment will not operate satisfactorily.  I believe that you have some such scheme in view."

We think it perfectly clear that Dyer was contemplating, in order to save himself expense, the use of material designed for a 33,000 volt line, on a line with a potential of 44,000 volts.

It is the insistence of Dyer, and of some expert witnesses introduced by him, that a good insulator designed for a 33,000 volt line could be used satisfactorily with a 44,000 volt current.  This is doubtless true with respect to a new insulator of a modern type.

But Dyer knew that these insulators had been purchased secondhand, and that the line on which they were to be used called for a maximum, rather than a minimum, of 33,000 volts.

It is obvious that the test made by the Tennessee Power Company was really to ascertain whether Dyer's line

would stand a 44,000 volt current. If it would, Dyer was saved the expense of erecting the step transformers, and also the expense of buying new modern insulators. If it would not, Dyer, by buying the modern insulators, still effected a very considerable saving in the omission of the step transformers.

We cannot say that the insulators were not reasonably fit for use in the line which Ragsdale contracted to build, and this is the test to which they must be subjected. It appears without contradiction in the record that they had been in actual use in a 33,000 volt line, seventy-two miles in length; that insulators are not injured by use; that exactly similar insulators were giving entire satisfaction in this seventy-mile line, where the maximum current used was 33,000 volts.

It is further to be noted that in making the test the insulators were attached by iron pins on top of the poles, and not by wooden pins. None of the insulators fastened on the cross-arms with wooden pins were destroyed even by the 44,000 volt current.

We are of opinion that, if these insulators had been used in such a line as Ragsdale's contract contemplated, at a maximum current of 33,000 volts, and especially if wooden pins had been used in the line, they would have been entirely suitable.

But, in any event, they never were subjected to any such test, and we are unable to say, on this record, that the preponderance of the evidence is against the chancellor's finding.

(b) It is next insisted by the appellant, Dyer, that he was to get these insulators at the exact price paid for them by Ragsdale; that Ragsdale had paid only ninety

cents apiece for 2,400 of the insulators, and $1.35 apiece for 244, and that the chancellor was in error in allowing a recovery on the basis of $1.35 each.

But the contract, already quoted, provides, not that the materials are to be sold at cost, but that they are to be sold and purchased "at reasonable prices." It is shown that the nearest price at which insulators of 33,000 voltage could have then been purchased was $2.25 each, plus the freight. We cannot say, on the record, that $1.35 was an unreasonable price for the insulators if they were reasonably fit (as we have held they were) for the purposes for which they were sold.

(c)  Dyer further insists that Ragsdale had purchased too many insulators; that, under the terms of the contract, he (Dyer) was only to take so many as "were necessary for the construction of the proposed line;" that only 1,984 of the insulators were needed to equip and test the line; and that the chancellor's decree should be modified accordingly.

The proposed line was twenty-six miles in length, and the specifications furnished by the Tennessee Power Company called for thirty-five poles to the mile. Three insulators were required to the pole. Hence, 2,730 insulators would be called for under Ragsdale's contract, and he testifies that "the double cross-arms would make it about 2,800."

If Dyer had entered into a "similar" contract with Lebanon, as was anticipated, the "proposed line" would have required more insulators than the 2,664 which he actually received from Ragsdale.

On the whole record we are of opinion that the chancellor reached a correct result, and his decree is accordingly affirmed.