# FORT LEAVENWORTH RAILROAD COMPANY *v.* LOWE.

IN ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

Argued April 9, 10, 1885.—Decided May 4, 1885.

When the United States acquire lands within the limits of a State by purchase, with the consent of the Legislature of the State, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings, the Constitution confers upon them exclusive jurisdiction of the tract so acquired ; but when they acquire such lands in any other way than by purchase with the consent of the Legislature, their exclusive jurisdiction is confined to the erections, buildings and land used for the public purposes of the Federal Government.

A State may, for such purposes cede to the United States exclusive jurisdiction over a tract of land within its limits in a manner not provided for in the Constitution of the United States ; and may prescribe conditions to the cession, if they are not inconsistent with the effective use of the property for the purposes intended.

If a State thus ceding to the United States exclusive jurisdiction over a tract within its limits, reserves to itself the right to tax private property therein, and the United States do not dissent, their acceptance of the grant, with the reservation will be presumed.

In the act admitting Kansas as a State, there was no reservation of Federal jurisdiction over the Fort Leavenworth Military Reservation. The State of Kansas subsequently ceded to the United States exclusive jurisdiction over the same, "saving further to said State the right to tax railroad, bridge, or other corporations, their franchises and property on said reservation." *Held,* that the property and franchises of a railroad company within the reservation was liable to pay taxes in the State of Kansas, imposed according to its laws.

This was a suit at law brought by the plaintiff in error as plaintiff below in a District Court of the State of Kansas to recover taxes imposed upon it and paid, on its property within the Fort Leavenworth Military Reservation. The defendant, sheriff of the County of Leavenworth, demurred to the complaint. The demurrer was sustained by the District Court, and the judgment thereon was affirmed by the Supreme Court of the State. This writ of error was brought to review that judgment. The facts which raise the federal question are stated in the opinion of the court.

*Mr. E. E. Cook* (*Mr. Thomas F. Withrow* and *Mr. M. A. Low* were with him on the brief) for plaintiff in error.

*Mr. W. Hallett Phillips* for defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

The plaintiff, a corporation organized under the laws of Kansas, was in 1880, and has ever since been, the owner of a railroad in the reservation of the United States in that State, known as the Fort Leavenworth Military Reservation. In that year its track, right of way, franchises, road-bed, telegraph line and instruments connected therewith on the Reservation, were assessed by the board of assessors of the State, and a tax of $394.40 levied thereon, which was paid by the railroad company under protest, in order to prevent a sale of the property. The present action is brought to recover back the money thus paid, on the ground that the property, being entirely within the Reservation, was exempt from assessment and taxation by the State.

The land constituting the Reservation was part of the territory acquired in 1803 by cession from France, and, until the formation of the State of Kansas, and her admission into the Union, the United States possessed the rights of a proprietor, and had political dominion and sovereignty over it. For many years before that admission it had been reserved from sale by the proper authorities of the United States for military purposes, and occupied by them as a military post. The jurisdiction of the United States over it during this time was necessarily paramount. But in 1861 Kansas was admitted into the Union upon an equal footing with the original States, that is, with the same rights of political dominion and sovereignty, subject like them only to the Constitution of the United States. Congress might undoubtedly, upon such admission, have stipulated for retention of the political authority, dominion and legislative power of the United States over the Reservation, so long as it should be used for military purposes by the government; that is, it could have excepted the place from the jurisdiction of Kansas, as one needed for the uses of the general

government.   But from some cause, inadvertence perhaps, or over-confidence that a recession of such jurisdiction could be had whenever desired, no such stipulation or exception was made.   The United States, therefore, retained, after the admission of the State, only the rights of an ordinary proprietor; except as an instrument for the execution of the powers of the general government, that part of the tract, which was actually used for a fort or military post, was beyond such control of the State, by taxation or otherwise, as would defeat its use for those purposes.   So far as the land constituting the Reservation was not used for military purposes, the possession of the United States was only that of an individual proprietor.   The State could have exercised, with reference to it, the same authority and jurisdiction which she could have exercised over similar property held by private parties.   This defect in the jurisdiction of the United States was called to the attention of the government in 1872.   In April of that year the Secretary of War addressed a communication to the Attorney-General, enclosing papers touching the Reservation, and submitting for his official opinion the questions, whether, under the Constitution, the reservation of the land for a site as a military post and for public buildings took it out of the operation of the law of March 3, 1859, 11 Stat. 430, and, if so, what action would be required on the part of the Executive or Congress to restore the land to the exclusive jurisdiction of the United States. The Attorney-General replied that the act admitting Kansas as a State into the Union had the effect to withdraw from federal jurisdiction all the territory within the boundaries of the new State, excepting only that of the Indians having treaties with the United States, which provided that without their consent such territory should not be subject to State jurisdiction, and the Reservation was not within this exception; and that to restore the federal jurisdiction over the land included in the Reservation, it would be necessary to obtain from the State of Kansas a cession of jurisdiction, which he had no doubt would upon application be readily granted by the State Legislature. 14 Opin. Attorneys General, 33.   It does not appear from the record before us that such application was ever made; but, on

the 22d of February, 1875, the Legislature of the State passed an act entitled "An Act to cede jurisdiction to the United States over the territory of the Fort Leavenworth Military Reservation," the first section of which is as follows:

"That exclusive jurisdiction be, and the same is hereby ceded to the United States over and within all the territory owned by the United States, and included within the limits of the United States military reservation known as the Fort Leavenworth Reservation in said State, as declared from time to time by the President of the United States, saving, however, to the said State the right to serve civil or criminal process within said Reservation, in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said State, but outside of said cession and Reservation; and saving further to said State the right to tax railroad, bridge, and other corporations, their franchises and property, on said Reservation." Laws of Kansas, 1875, p. 95.

The question as to the right of the plaintiff to recover back the taxes paid depends upon the validity and effect of the last saving clause in this act. As we have said, there is no evidence before us that any application was made by the United States for this legislation, but, as it conferred a benefit, the acceptance of the act is to be presumed in the absence of any dissent on their part. The contention of the plaintiff is that the act of cession operated under the Constitution to vest in the United States exclusive jurisdiction over the Reservation, and that the last saving clause, being inconsistent with that result, is to be rejected. The Constitution provides that "Congress shall have power to *exercise exclusive legislation in all cases whatsoever* over such district, (not exceeding ten miles square,) as may, by cession of particular States and the acceptance of Congress, become the seat of the government of the United States, and *to exercise like authority* over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." Art. 1, sec. 8.

The necessity of complete jurisdiction over the place which should be selected as the seat of government was obvious to

the framers of the Constitution. Unless it were conferred the deliberations of Congress might in times of excitement be exposed to interruptions without adequate means of protection; its members, and the officers of the government, be subjected to insult and intimidation, and the public archives be in danger of destruction. The Federalist, in support of this clause in the Constitution, in addition to these reasons, urged that " a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty, might bring on the national councils an imputation of awe or influence, equally dishonorable to the government and dissatisfactory to the other members of the confederacy." No. 43.

The necessity of supreme legislative authority over the seat of government was forcibly impressed upon the members of the constitutional convention by occurrences which took place near the close of the Revolutionary War. At that time, while Congress was in session in Philadelphia, it was surrounded and insulted by a body of mutineers of the Continental Army. In giving an account of this proceeding, Mr. Rawle, in his Treatise on the Constitution, says of the action of Congress: " It applied to the executive authority of Pennsylvania, for defence ; but, under the ill-conceived constitution of the State at that time, the executive power was vested in a council, consisting of thirteen members, and they possessed or exhibited so little energy, and such apparent intimidation, that the Congress indignantly removed to New Jersey, whose inhabitants. welcomed it with promises of defending it. It remained for some time at Princeton without being again insulted, till; for the sake of greater convenience, it adjourned to Annapolis. The general dissatisfaction with the proceedings of the executive authority of Pennsylvania, and the degrading spectacle of a fugitive Congress, suggested the remedial provisions now under consideration." Rawle, Constitution of the United States, 113. Of this proceeding Mr. Justice Story remarks : " If such a lesson could have been lost upon the people, it would have been as humiliating to their intelligence as it would have been offensive to their honor." 2 Story Constitution, § 1219.

Upon the second part of the clause in question, giving power to "exercise like authority," that is, of exclusive legislation "over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings," the Federalist observes that the necessity of this authority is not less evident. "The public money expended on such places," it adds, "and the public property deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the States concerned in every such establishment." "The power," says Mr. Justice Story, repeating the substance of Mr. Madison's language, "is wholly unexceptionable, since it can only be exercised at the will of the State, and therefore it is placed beyond all reasonable scruple."

This power of exclusive legislation is to be exercised, as thus seen, over places purchased, by consent of the Legislatures of the States in which they are situated, for the specific purposes enumerated. It would seem to have been the opinion of the framers of the Constitution that, without the consent of the States, the new government would not be able to acquire lands within them; and therefore it was provided that when it might require such lands for the erection of forts and other buildings for the defence of the country, or the discharge of other duties devolving upon it, and the consent of the States in which they were situated was obtained for their acquisition, such consent should carry with it political dominion and legislative authority over them. Purchase with such consent was the only mode then thought of for the acquisition by the general government of title to lands in the States. Since the adoption of the Constitution this view has not generally prevailed. Such consent has not always been obtained, nor supposed necessary, for the purchase by the general government of lands within the States. If any doubt has ever existed as to its power thus to acquire lands within the States, it has not had sufficient strength to

create any effective dissent from the general opinion.   The con-
sent of the States to the purchase of lands within them for the
special purposes named is, however, essential, under the Con-
stitution, to the transfer to the general government, with the
title, of political jurisdiction and dominion.   Where lands are
acquired without such consent, the possession of the United
States, unless political jurisdiction be ceded to them in some
other way, is simply that of an ordinary proprietor.   The
property in that case, unless used as a means to carry out
the purposes of the government, is subject to the legislative
authority and control of the States equally with the property
of private individuals.

  But not only by direct purchase have the United States been
able to acquire lands they needed without the consent of the
States, but it has been held that they possess the right of
eminent domain within the States, using those terms, not as
expressing the ultimate dominion or title to property, but as
indicating the right to take private property for public uses
when needed to execute the powers conferred by the Consti-
tution; and that the general government is not dependent upon
the caprice of individuals or the will of State Legislatures
in the acquisition of such lands as may be required for the full
and effective exercise of its powers.   This doctrine was au-
thoritatively declared in *Kohl* v. *United States*, 91 U. S. 367.
All the judges of the court agreed in the possession by the
general government of this right, although there was a differ-
ence of opinion whether provision for the exercise of the right
had been made in that case.   The court, after observing that
lands in the States are needed for forts, armories, and arsenals,
for navy-yards and light-houses, for custom-houses and court-
houses, and for other public uses, said : " If the right to acquire
property for such uses may be made a barren right by the un-
willingness of property-holders to sell, or by the action of a
State prohibiting a sale to the federal government, the con-
stitutional grants of power may be rendered nugatory, and the
government is dependent for its practical existence upon the
will of a State, or even upon that of a private citizen."   The
right to acquire property in this way, by condemnation, may

be exerted either through tribunals expressly designated by Congress, or by resort to tribunals of the State in which the property is situated, with her consent for that purpose. Such consent will always be presumed in the absence of express prohibition. *United States* v. *Jones,* 109 U. S. 513, 519; *Matter of Petition of United States,* 96 N. Y. 227.

Besides these modes of acquisition, the United States possessed, on the adoption of the Constitution, an immense domain lying north and west of the Ohio River, acquired as the result of the Revolutionary War from Great Britain, or by cessions from Virginia, Massachusetts and Connecticut; and, since the adoption of the Constitution, they have by cession from foreign countries, come into the ownership of a territory still larger, lying between the Mississippi River and the Pacific Ocean, and out of these territories several States have been formed and admitted into the Union. The proprietorship of the United States in large tracts of land within these States has remained after their admission. There has been, therefore, no necessity for them to purchase or to condemn lands within those States, for forts, arsenals, and other public buildings, unless they had disposed of what they afterwards needed. Having the title, they have usually reserved certain portions of their lands from sale or other disposition, for the uses of the government.

This brief statement as to the different modes in which the United States have acquired title to lands upon which public buildings have been erected will serve to explain the nature of their jurisdiction over such places, and the consistency with each other of decisions on the subject by Federal and State tribunals, and of opinions of the Attorneys General.

When the title is acquired by purchase by consent of the Legislatures of the States, the federal jurisdiction is exclusive of all State authority. This follows from the declaration of the Constitution that Congress shall have " like authority " over such places as it has over the district which is the seat of government; that is, the power of " exclusive legislation in all cases whatsoever." Broader or clearer language could not be used to exclude all other authority than that of Congress; and

that no other authority can be exercised over them has been the uniform opinion of Federal and State tribunals, and of the Attorneys General.

The reservation which has usually accompanied the consent of the States that civil and criminal process of the State courts may be served in the places purchased, is not considered as interfering in any respect with the supremacy of the United States over them; but is admitted to prevent them from becoming an asylum for fugitives from justice. And Congress, by statute passed in 1795, declared that cessions from the States of the jurisdiction of places where light-houses, beacons, buoys, or public piers were or might be erected, with such reservations, should be deemed sufficient for the support and erection of such structures, and if no such reservation had been made, or in future cessions for those purposes should be omitted, civil and criminal process issued under the authority of the State or of the United States might be served and executed within them. 1 Stat. 426, ch. 40.

Thus, in *United States* v. *Cornell*, 2 Mason, 60, it was held by Mr. Justice Story, that the purchase of land by the United States for public purposes, within the limits of a State, did not of itself oust the jurisdiction or sovereignty of the State over the lands purchased; but that the purchase must be by consent of the Legislature of the State, and then the jurisdiction of the United States under the Constitution became exclusive. In that case the defendant was indicted for murder committed in Fort Adams, in Newport Harbor, Rhode Island. The place had been purchased by the United States with the consent of the State, to which was added the reservation mentioned, as to the service of civil and criminal process within it. The main questions presented for decision were, whether the sole and exclusive jurisdiction over the place vested in the United States without a formal act of cession, and whether the reservation as to service of process made the jurisdiction concurrent with that of the State. The first question was answered, as above, that the purchase by consent gave the exclusive jurisdiction; and, as to the second question, the court said: " In its terms, it certainly does not contain any reservation of concurrent jurisdic-

tion or legislation.  It provides only that civil and criminal process issued under the authority of the State, which must, of course, be for acts done within and cognizable by the State, may be executed within the ceded lands, notwithstanding the cession.   Not a word is said from which we can infer that it was intended that the State should have a right to punish for acts done within the ceded lands.   The whole apparent object is answered by considering the clause as meant to prevent these lands from becoming a sanctuary for fugitives from justice for acts done within the acknowledged jurisdiction of the State. Now, there is nothing incompatible with the exclusive sovereignty or jurisdiction of one State that it should permit another State in such cases to execute its process within its limits. And a cession of exclusive jurisdiction may well be made with a reservation of a right of this nature, which then operates only as a condition annexed to the cession, and as an agreement of the new sovereign to permit its free exercise as *quoad hoc* his own process.   This is the light in which clauses of this nature (which are very frequent in grants made by the States to the United States) have been received by this court on various occasions on which the subject has been heretofore brought before it for consideration, and it is the same light in which it has also been received by a very learned State court.   In our judgment it comports entirely with the apparent intention of the parties, and gives effect to acts which might otherwise, perhaps, be construed entirely nugatory.   For it may well be doubted whether Congress is, by the terms of the Constitution, at liberty to purchase lands for forts, dock-yards, &c., with the consent of the State Legislature, where such consent is so qualified that it will not justify the exclusive legislation of Congress there.   It may well be doubted if such consent be not utterly void.   *Ut res magis valeat quam pereat,* we are bound to give the present act a different construction if it may reasonably be done; and we have not the least hesitation in declaring that the true interpretation of the present proviso leaves the sole and exclusive jurisdiction of Fort Adams in the United States."

The case referred to in which the subject was considered by a learned State court is that of *Commonwealth* v. *Clary*, 8

Mass. 72. There the Supreme Court of Massachusetts nead that the courts of the Commonwealth could not take cognizance of offences committed upon lands in the town of Springfield purchased with the consent of the Commonwealth by the United States for the purpose of erecting arsenals upon them. That was the case of a prosecution against the defendant for selling spirituous liquors on the land without a license, contrary to a statute of the State. But the court held that the law had no operation within the lands mentioned. "The territory," it said, "on which the offence charged is agreed to have been committed is the territory of the United States, over which the Congress have exclusive power of legislation." It added, that "the assent of the Commonwealth to the purchase of this territory by the United States had this condition annexed to it, that civil and criminal process might be served therein by the officers of the Commonwealth. This condition was made with a view to prevent the territory from becoming a sanctuary for debtors and criminals; and from the subsequent assent of the United States to the said condition, evidenced by their making the purchase, it results that the officers of the Commonwealth, in executing such process, act under the authority of the United States. No offences committed within that territory are committed against the laws of this Commonwealth, nor can such offences be punishable by the courts of the Commonwealth unless the Congress of the United States should give to the said courts jurisdiction thereof." In *Mitchell* v. *Tibbitts*, 17 Pick. 298, before the same court, years afterwards, it was held that a vessel employed in transporting stone from Maine to the navy-yard in Charlestown, Mass., a place purchased by the United States with the consent of the State, was not employed in transporting stone within the Commonwealth, and therefore committed no offence in disregarding a statute making certain requirements of vessels thus employed. The court said that to bring a vessel within the description of the statute, she must be employed in landing stone at, or taking stone from, some place in the Commonwealth, and that the law of Massachusetts did not extend to and operate within the territory ceded, adopting the principle of its previous decision in 8 Mass.

In March, 1841, the House of Representatives of Massachusetts requested of the Justices of the Supreme Judicial Court of that State their opinion whether persons residing on lands in that State purchased by or ceded to the United States for navy-yards, arsenals, dock-yards, forts, light-houses, hospitals and armories, were entitled to the benefits of the State common schools for their children in the towns where such lands were located; and the Justices replied that, "where the general consent of the Commonwealth is given to the purchase of territory by the United States for forts and dock-yards, and where there is no other condition or reservation in the act granting such consent, but that of a concurrent jurisdiction of the State for the service of civil process and criminal process against persons charged with crimes committed out of such territory, the government of the United States has the sole and exclusive jurisdiction over such territory for all purposes of legislation and jurisprudence with the single exception expressed; and consequently that no persons are amenable to the laws of the Commonwealth for crimes and offences committed within said territory; and that persons residing within the same do not acquire the civil and political privileges, nor do they become subject to the civil duties and obligations, of inhabitants of the towns within which such territory is situated." And accordingly they were of opinion that persons residing on such lands were not entitled to the benefits of the common schools for their children in the towns in which such lands were situated. 1 Met. 580.

In *Sinks* v. *Reese*, 19 Ohio St. 306, the question came before the Supreme Court of Ohio, as to the effect of a proviso in the act of that State, ceding to the United States its jurisdiction over lands within her limits for the purposes of a National Asylum for Disabled Volunteer Soldiers, which was, that nothing in the act should be construed to prevent the officers, employees and inmates of the asylum, who were qualified voters of the State, from exercising the right of suffrage at all township, county, and State elections in the township in which the National Asylum should be located. And it was held that, upon the purchase of the territory by the United

States, with the consent of the Legislature of the State, the general government became invested with exclusive jurisdiction over it and its appurtenances in all cases whatsoever; and that the inmates of such asylum resident within the territory, being within such exclusive jurisdiction, were not residents of the State so as to entitle them to vote, within the meaning of the Constitution, which conferred the elective franchise upon its residents alone.

To the same effect have been the opinions of the Attorneys General, when called for by the head of one of the Departments.   Thus, in the case of the armory at Harper's Ferry, in Virginia, the question arose whether officers of the army, or other persons, residing in the limits of the armory, the lands composing which had been purchased by consent of the State, were liable to taxation by her.   The consent had been accompanied by a cession of jurisdiction, with a declaration that the State retained concurrent jurisdiction with the United States over the place, so far as it could consistently with the acts giving consent to the purchase and ceding jurisdiction; and that its courts, magistrates, and officers might take such cognizance, execute such processes, and discharge such other legal functions within it as might not be incompatible with the true intent and meaning of those acts.   The question having been submitted to the Attorney-General, he replied that the sole object and effect of the reservation was to prevent the place from becoming a sanctuary for fugitives from justice, for acts done within the acknowledged jurisdiction of the State, and that in all other respects the exterritoriality of the armory at Harper's Ferry was complete, in so far as regards the State; that the persons in the employment of the United States, actually residing in the limits of the armory, did not possess the civil and political rights of citizens of the State, nor were they subject to the tax and other obligations of such citizens.   6 Opins. Attorneys General, 577.   See also the case of The New York Post Office Site, 10 Opins. Attorneys General, 35.

These authorities are sufficient to support the proposition which follows naturally from the language of the Constitution, that no other legislative power than that of Congress can be

exercised over lands within a State purchased by the United States with her consent for one of the purposes designated; and that such consent under the Constitution operates to exclude all other legislative authority.

But with reference to lands owned by the United States, acquired by purchase without the consent of the State, or by cessions from other governments, the case is different. Story, in his Commentaries on the Constitution, says: "If there has been no cession by the State of the place, although it has been constantly occupied and used under purchase, or otherwise, by the United States for a fort or arsenal, or other constitutional purpose, the State jurisdiction still remains complete and perfect;" and in support of this statement he refers to *People* v. *Godfrey*, 17 Johns. 225. In that case the land on which Fort Niagara was erected, in New York, never having been ceded by the State to the United States, it was adjudged that the courts of the State had jurisdiction of crimes or offences against the laws of the State committed within the fort or its precincts, although it had been garrisoned by the troops of the United States and held by them since its surrender by Great Britain pursuant to the treaties of 1783 and 1794. In deciding the case, the court said that the possession of the post by the United States must be considered as a possession for the State, not in derogation of her rights, observing that it regarded it as a fundamental principle that the rights of sovereignty were not to be taken away by implication. "If the United States," the court added, "had the right of exclusive legislation over the Fortress of Niagara they would have also exclusive jurisdiction; but we are of opinion that the right of exclusive legislation within the territorial limits of any State can be acquired by the United States only in the mode pointed out in the Constitution, *by purchase, by consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.* The essence of that provision is that the State shall freely cede the particular place to the United States for one of the specific and enumerated objects. This jurisdiction cannot be acquired tortiously or by disseisin of the State; much less can it be acquired

by mere occupancy, with the implied or tacit consent of the State, when such occupancy is for the purpose of protection."

Where, therefore, lands are acquired in any other way by the United States within the limits of a State than by purchase with her consent, they will hold the lands subject to this qualification : that if upon them forts, arsenals, or other public buildings are erected for the uses of the general government, such buildings, with their appurtenances, as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the State as would destroy or impair their effective use for the purposes designed.  Such is the law with reference to all instrumentalities created by the general government.  Their exemption from State control is essential to the independence and sovereign authority of the United States within the sphere of their delegated powers.  But, when not used as such instrumentalities, the legislative power of the State over the places acquired will be as full and complete as over any other places within her limits.

As already stated, the land constituting the Fort Leavenworth Military Reservation was not purchased, but was owned by the United States by cession from France many years before Kansas became a State ; and whatever political sovereignty and dominion the United States had over the place comes from the cession of the State since her admission into the Union.  It not being a case where exclusive legislative authority is vested by the Constitution of the United States, that cession could be accompanied with such conditions as the State might see fit to annex not inconsistent with the free and effective use of the fort as a military post.

In the recent case of the Fort Porter Military Reservation, the opinion of the Attorney General was in conformity with this view of the law.  On the 28th of February, 1842, the Legislature of New York authorized the commissioners of its land office to cede to the United States the title to certain land belonging to the State within her limits, "for military purposes, reserving a free and uninterrupted use and control in the canal commissioners of all that may be necessary for canal and harbor purposes." Under this act the title was conveyed to the United States.

The act also ced.d to them jurisdiction over the land. In 1880, the superintendent of public works in New York, upon whom the duties of canal commissioner were devolved, informed the Secretary of War that the interests of the State required that the land, or a portion of it, should be occupied by her for canal purposes, claiming the right to thus occupy it under the reservation in the act of cession. The opinion of the Attorney General was, therefore, requested as to the authority of the Secretary of War to permit the State, under these considerations, to use so much of the land as would not interfere with its use for military purposes. The Attorney General replied that the United States, under the grant, held the land for military purposes, and that the reservation in favor of the State could be deemed valid only so far as it was not repugnant to the grant; that, hence, the right of the State to occupy and use the premises for canal or harbor purposes must be regarded as limited or restricted by the purposes of the grant; that, when such use and occupation would defeat or interfere with those purposes, the right of the State did not exist; but, when they would not interfere with those purposes, the State was entitled to use so much of the land as might be necessary for her canal and harbor purposes. 16 Opin. Attorneys General, 592.

We are here met with the objection that the Legislature of a State has no power to cede away her jurisdiction and legislative power over any portion of her territory, except as such cession follows under the Constitution from her consent to a purchase by the United States for some one of the purposes mentioned. If this were so, it would not aid the railroad company; the jurisdiction of the State would then remain as it previously existed. But aside from this consideration, it is undoubtedly true that the State, whether represented by her Legislature, or through a convention specially called for that purpose, is incompetent to cede her political jurisdiction and legislative authority over any part of her territory to a foreign country, without the concurrence of the general government. The jurisdiction of the United States extends over all the territory within the States, and, therefore, their authority must be obtained, as well as that of the State within which the territory

is situated, before any cession of sovereignty or political juris-
diction can be made to a foreign country. And so when
questions arose as to the northeastern boundary, in Maine, be-
tween Great Britain and the United States, and negotiations
were in progress for a treaty to settle the boundary, it was
deemed necessary on the part of our government to secure the
co-operation and concurrence of Maine, so far as such settle-
ment might involve a cession of her sovereignty and jurisdiction
as well as title to territory claimed by her, and of Massachusetts,
so far as it might involve a cession of title to lands held by her.
Both Maine and Massachusetts appointed commissioners to act
with the Secretary of State, and after much negotiation the
claims of the two States were adjusted, and the disputed
questions of boundary settled. The commissioners of Maine
were appointed by her Legislature; and those of Massachusetts
by her Governor under authority of an act of her Legislature.
It was not deemed necessary to call a convention of the people
in either of them to give to the commissioners the requisite au-
thority to act effectively for their respective States. 5 Web-
ster's Works, 99; 6 Ib. 273.

In their relation to the general government, the States of
the Union stand in a very different position from that which
they hold to foreign governments. Though the jurisdiction
and authority of the general government are essentially dif-
ferent from those of the State, they are not those of a differ-
ent country; and the two, the State and general government,
may deal with each other in any way they may deem best to
carry out the purposes of the Constitution. It is for the pro-
tection and interests of the States, their people and property,
as well as for the protection and interests of the people gener-
ally of the United States, that forts, arsenals, and other build-
ings for public uses are constructed within the States. As
instrumentalities for the execution of the powers of the gen-
eral government, they are, as already said, exempt from such
control of the States as would defeat or impair their use for
those purposes; and if, to their more effective use, a cession of
legislative authority and political jurisdiction by the State
would be desirable, we do not perceive any objection to its

grant by the Legislature of the State. Such cession is really as much for the benefit of the State as it is for the benefit of the United States. It is necessarily temporary, to be exercised only so long as the places continue to be used for the public purposes for which the property was acquired or reserved from sale. When they cease to be thus used, the jurisdiction reverts to the State.

The Military Reservation of Fort Leavenworth was not, as already said, acquired by purchase with the consent of Kansas. And her cession of jurisdiction is not of exclusive legislative authority over the land, except so far as that may be necessary for its use as a military post; and it is not contended that the saving clause in the act of cession interferes with such use. There is, therefore, no constitutional prohibition against the enforcement of that clause. The right of the State to subject the railroad property to taxation exists as before the cession. The invalidity of the tax levied not being asserted on any other ground than the supposed exclusive jurisdiction of the United States over the reservation notwithstanding the saving clause, the judgment of the court below must be

*Affirmed.*