**STATE of Alaska, Appellant,**

v.

**David T. PRINCE, Appellee.**

**No. A–7681. .**

Court of Appeals of Alaska.

Aug. 16, 2002.

---

16. *Moeller I,* 27 P.3d at 316.

17. *Id.* (quoting *House v. House,* 779 P.2d 1204, 1208 (Alaska 1989)).

18. *Id.*

Douglas H. Kossler, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

John B. Salemi, St. Johns, Michigan, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Under Alaska's "local option" law, AS 04.11.491, the voters of a municipality may choose to prohibit the sale, the importation, or even the possession of alcoholic beverages within their city. The voters of St. Mary's have exercised this authority; it is unlawful to bring alcoholic beverages into St. Mary's or to possess alcoholic beverages within its boundaries.

The question presented in this appeal is whether this ban on alcoholic beverages can be enforced on state-owned land that lies within the boundaries of St. Mary's. The answer is yes. Enforcement of the municipal ban on the importation and possession of alcoholic beverages is fully consistent with state law. Indeed, it is state law that authorizes local voters to restrict or ban alcoholic beverages within their communities, and it is state law that defines and punishes the offense of violating such local bans. Accord-

ingly, the ban on alcoholic beverages applies to state-owned property lying within the municipal boundaries of St. Mary's.

*Underlying facts, and explanation of our map*

The municipality of St. Mary's lies on the Andreafsky River in western Alaska, about three miles upstream from where the Andreafsky flows into the Yukon River. As authorized by AS 04.11.491, the voters of St. Mary's have approved a ban on the importation and possession of alcoholic beverages within their municipality.

On the night of June 28, 1999, the St. Mary's police received a tip from the Alaska State Troopers that someone was bringing alcoholic beverages to St. Mary's by boat via the Andreafsky River. The boat described by the troopers arrived in St. Mary's early the next morning. The St. Mary's police found the boat with its bow on the beach and its stern in the river. Two men—David T. Prince and a co-defendant—were lying in the boat, either asleep or passed out from intoxication.

The officers observed cartons of three different brands of beer in the boat. A subsequent search of the boat yielded 119 bottles of whiskey, 12 bottles of rum, and 8 bottles of liqueur. Prince was charged with two felonies under state law: importation of 12 liters or more of distilled spirits into a municipality that has prohibited importation of alcoholic

beverages, and possession of alcoholic beverages for sale in a municipality that has prohibited sale of alcoholic beverages.[1]

The attached map will help readers understand the discussion that follows. This map depicts the portion of the Andreafsky River and adjacent river bank where Prince's boat landed and was seized. The dark black lines show the pertinent municipal boundaries of St. Mary's as certified in March 1981 by the Alaska Department of Community and Regional Affairs. (This department has since been renamed the Department of Community and Economic Development.)[2]

The Department used a metes and bounds description when it certified the boundaries of St. Mary's; but in this case, a picture is easily worth the 468 words of that verbal description.

The "X" and the accompanying initials were placed on the map by St. Mary's city manager Walton Smith, who appeared as a witness at the evidentiary hearing in this case. Smith drew the "X" to mark the spot where he observed Prince's boat on the morning in question.

The scale of this map is approximately 1½ inch = 1 mile. (The numbered boxes represent sections within Range 76 West, Township 23 North, Seward Meridian. These sections are slightly less than 1 mile on each side.)

1. AS 04.16.200(e) and AS 04.16.200(b), respectively.

2. Under Alaska law, municipal boundaries (and any changes to those boundaries) must be approved by the Local Boundary Commission, an arm of the Department of Community and Economic Development. *See* AS 29.05.060–100, AS 29.06.040–050, and AS 29.06.090–130.

*The superior court's dismissal of the indictment*

Following his indictment, Prince asked the superior court to dismiss the charges. He contended that he had committed no punishable act within the municipality of St. Mary's.

Prince conceded that he had brought liquor with him in the boat, but he claimed that neither he nor his boat had ever been

within the boundaries of St. Mary's. Specifically, Prince pointed out that the State of Alaska owns the portion of the river and the river bank where his boat landed, and he argued that a municipality can not assert jurisdiction over land owned by the State of Alaska.

Prince acknowledged that the State had leased this river land to St. Mary's (for construction of dock improvements), but he contended that this land could not be part of the city itself because the State remained owner of the land in fee simple. Prince's attorney summarized his argument as follows:

> *Defense Attorney:* A conviction for importation [or possession] requires, by definition, that the accused actually enter the community in which possession of alcohol has been banned.... A person may stand, or float, outside a municipality where possession [of alcoholic beverages] is banned by local option till doomsday and still not commit a crime. The *actus reus* of the crime is crossing the municipal boundary. As Mr. Prince did not cross the boundary, he did not commit the crime.

In response to Prince's motion, the State asked the superior court to hold an evidentiary hearing so that the State could establish that the municipal boundaries of St. Mary's encompassed the portion of the Andreafsky River and adjacent shore where Prince's boat was found. The State did, in fact, present testimony and exhibits to this effect.

In particular, the State introduced the official "Certification of Boundaries [of the] City of St. Mary's"—a document issued by the Department of Community and Regional Affairs in 1981, which gives a metes and bounds description of the municipal boundaries. The State also introduced two section maps that physically depict these boundaries. Finally, the State presented two witnesses who identified the spot where Prince's boat landed on the north bank of the Andreafsky River—a spot well within the municipal boundaries. Indeed, as shown in our accompanying map, the city of St. Mary's extends south across and beyond the Andreafsky River for more than another mile.

But Prince's attorney declared that all this evidence was "ultimately irrelevant":

> *Defense Attorney:* The issue here is quite simple.... [T]he Submerged Lands Act of 1953 ... ceded to the states ownership of, and title to, all lands beneath navigable state waterways. The Submerged Lands Act was made applicable to Alaska at the time of statehood.... The City of St. Mary's may define its borders to include the [Andreafsky River], but it cannot annex what it does not own. The boundaries of the City may extend over the river, but they do not include the river [itself] and the lands below [the] mean high water [line].

In other words, Prince argued that even though state-owned land may lie within the ostensible boundaries of a municipality, the state-owned land constitutes an enclave where municipal laws—and, in particular, municipal bans on alcohol—hold no sway.

After considering this matter, Superior Court Judge Dale O. Curda agreed with Prince. In his written decision dismissing the indictment, Judge Curda adopted Prince's contention that St. Mary's could not exercise jurisdiction over land owned by the State:

> Since [the] lands [in question] are owned by the state ..., they cannot be annexed by the city. At the time the alcohol was seized, Prince's boat was anchored on ... state land, not land belonging to the City of St. Mary's.... [B]ecause the state presented no ... evidence [that] Prince entered the city in possession of alcohol, the indictment must be dismissed.

*The parties' arguments on appeal, and our analysis of Judge Curda's decision*

The State now asks us to reverse the superior court's dismissal of the indictment.

■ There is some question as to whether the State is entitled to appeal the superior court's dismissal of the indictment. One other charge against Prince—a misdemeanor—was not dismissed and remains pending. Thus, the superior court's dismissal of the indictment is arguably not a "final order". However, we conclude that this issue is moot. Even assuming that the State had no right to

appeal the dismissal of the indictment, this court has the power to treat the State's ostensible appeal as a petition for review.[3] Given the legal issue presented here, we would grant the petition and decide the validity of the indictment.

The State concedes that the land at issue is owned by the State.[4] However, the State contends that the St. Mary's ban on alcoholic beverages applies to all land within its municipal boundaries, even land owned by the State.

Prince, for his part, has abandoned his contention that state-owned land is exempt from municipal law. But rather than conceding that the superior court committed error, Prince now argues that Judge Curda did not rely on this theory when he dismissed the indictment. Prince asserts that Judge Curda did not base his decision on the fact that the State owned the land in question, but rather on the conclusion that the State failed to prove that this land was physically located within the boundaries of St. Mary's.

We reject Prince's interpretation of Judge Curda's ruling. In Prince's motion to dismiss the indictment, he did not assert that his boat was found outside the boundaries of St. Mary's—except in the technical sense that the boat was on state-owned land and that this state-owned land constituted a protected enclave within the municipal boundaries. We concede that Judge Curda's decision is worded ambiguously in places, but he was not responding to the argument that Prince makes on appeal. Rather, he was responding to Prince's argument that, as a legal matter, state-owned land is exempt from municipal jurisdiction.

Moreover, even if Prince were correct— i.e., even if Judge Curda found that Prince's boat did not land within the physical boundaries of St. Mary's—this finding would be clearly erroneous. As can be seen from our map, the boundaries of St. Mary's extend for more than a mile in any direction from the spot on the north bank of the Andreafsky where Prince's boat landed.

Thus, if Prince is to prevail in this appeal, it must be under the theory that he advanced in the superior court and that he now declines to argue: the theory that state-owned land within the boundaries of a municipality is exempt from a municipal ban on the importation and possession of alcoholic beverages.

*A municipality can enforce its ordinances on state or federal land within its boundaries unless the state or federal government has taken action to exempt its property from local control*

■ Generally speaking, a municipality's authority to enforce its ordinances on land within its boundaries does not depend on the identity of the landowner. (Conversely, when a municipality purchases land outside its borders, it cannot enforce its ordinances on that land except as authorized by state law. *See* AS 29.35.020.)

■ The situation is more complicated when the land is owned by the state government (or the federal government). Because the state and federal governments possess a superior sovereignty, they are entitled to enact laws that exempt their property from municipal authority in whole or in part. But it is not state or federal ownership of the land that creates this exemption from municipal authority. Rather, it is the state and federal governments' exercise of their lawmaking power—their power to define and limit the scope of a subordinate sovereign's political authority. Thus, when the State of Alaska has not expressly or impliedly limited municipal authority to enforce ordinances on

3. *See Puhlman v. Turner,* 874 P.2d 291, 293 n. 3 (Alaska 1994); *Juneau v. Thibodeau,* 595 P.2d 626, 631 (Alaska 1979); *Moore v. State,* 895 P.2d 507, 509 n. 2 (Alaska App.1995).

4. In the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301–1356, the federal government gave the states title to all lands lying beneath navigable state waterways and upon the adjacent shores, up to the ordinary high water mark. When Alaska became a state, it received the benefits of this Act. *See* the Alaska Statehood Act, Public Law 85–508, § 6(m), 72 Stat. 339, 343 (1983). Because the Andreafsky is a navigable river, the State owns the land below the river and along its shores, up to the mean high water line—including the spot where Prince's boat landed. The State's ownership of this land was confirmed by a plat that Prince introduced at the evidentiary hearing in the superior court.

state-owned land, that land remains subject to municipal authority to the same extent as any other landowner's property.

The United States Supreme Court discussed this principle of law in *Ft. Leavenworth Railway Co. v. Lowe*, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885). The question was whether the State of Kansas could levy property taxes on a railroad located within a federal military reservation—land owned by the federal government and set aside for future military uses. The railroad argued that because the land was owned by the federal government, the land (and the property on it) was exempt from state tax laws. The Supreme Court rejected this contention:

> The land constituting the [military] reservation was part of the territory acquired in 1803 by cession from France [—*i.e.*, in the Louisiana Purchase.] [U]ntil the formation of the state of Kansas, and her admission into the Union, the United States possessed the rights of a proprietor, and had political dominion and sovereignty over [this land].... But in 1861[,] Kansas was admitted into the Union upon an equal footing with the original states; that is, with the same rights of political dominion and sovereignty, subject like them only to the constitution of the United States. Congress might undoubtedly ... have stipulated for retention of ... political authority ... over the [military] reservation ...; that is, it could have excepted the place from the jurisdiction of Kansas, as one needed for the uses of the [federal] government. But ... no such stipulation or exception was made. The United States, therefore, retained ... only the rights of an ordinary proprietor; except [for] that part of the tract, which was actually used for a fort or military post, [which would put that part] beyond such control of the state, by taxation or otherwise, as would defeat its use for those purposes. [But so] far as the land constituting the reservation was not used for military purposes, the possession of the United States was only that of an individual proprietor. The state could have exercised, with reference to it, the same authority and jurisdiction which she could have exercised over similar property held by private parties.

*Id.*, 114 U.S. at 526–27, 5 S.Ct. at 996, 29 L.Ed. at 265.

The Supreme Court of Virginia reached a similar conclusion in *Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978). The defendant in *Smith* raped and then murdered a woman along the banks of the James River.[5] The defendant "acknowledg[ed] that the crime was committed within the geographical boundaries of [Virginia]", but he challenged the jurisdiction of the Virginia courts to try him, "since the land in question is owned by the United States". Smith argued "[that] it was incumbent upon the Commonwealth to show that the United States did not have exclusive jurisdiction over crimes committed [on this land]".[6] The Virginia Supreme Court answered as follows:

> It is well settled ... that the mere ownership of land by the United States does not divest a state of its jurisdiction over that land, and that the nature and extent of the federal jurisdiction is dependent upon the consent of the state. *James v. Dravo Contracting Co.*, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937)[.] *Accord, Waltrip v. Commonwealth*, 189 Va. 365, 53 S.E.2d 14 (1949). The United States was ceded concurrent jurisdiction by statute over crimes committed on land to which it holds title within [this] Commonwealth. [U.S.] Code § 7.1 21(1) (Replacement Vol.1973).... In light of the cession [of concurrent jurisdiction] by statute, it is presumed that the Commonwealth retains concurrent jurisdiction over the area embracing the locus of the crime. To hold otherwise, would be to require the Commonwealth to prove the negative.... Since defendant adduced no evidence to show the affirmative, the presumption prevails and the trial court's [denial of] the motion to dismiss was proper.

*Smith*, 248 S.E.2d at 139–140.

 These cases stand for the proposition that federal ownership of land does not,

---

5. *Smith*, 248 S.E.2d at 135.

6. *Id.*

*per se,* forbid a state from exercising its political authority over the land. An analogous rule applies to municipal-state relations: state ownership of land does not, *per se,* forbid a municipality from exercising political authority over the land.

The Ohio Court of Appeals recently addressed this issue in *City of Columbus v. Spingola,* 144 Ohio App.3d 76, 759 N.E.2d 473 (2001). The city had enacted an ordinance that forbade acts of "ethnic intimidation". The issue was whether the city could enforce this ordinance against a defendant who committed an act of intimidation on land owned by the State of Ohio—the grounds of the Ohio Statehouse. The court concluded that, under the home rule provisions of Ohio law, "municipalities [are authorized] to adopt and enforce police regulations [on all land] within their territorial limits, provided the regulations are not in conflict with [the] general laws [of the State of Ohio]".[7]

Finally, in *People v. Weiner,* 85 Misc.2d 161, 378 N.Y.S.2d 966 (N.Y.City Crim.Ct. 1976), the defendant was charged with criminal mischief for defacing a wall at the United Nations Building. He argued that the City of New York had no jurisdiction to prosecute him because the United Nations grounds are owned by that international organization.[8] The court concluded that the international ownership of the property did not deprive the City of New York of jurisdiction over the person of the defendant or the subject matter of the offense—because, under the terms of a treaty between the United States and the United Nations (a treaty known as the "Headquarters Agreement") criminal infractions committed on property located within the United Nations headquarters district are, for jurisdictional purposes, to be deemed crimes committed against property located in New York County.[9] The court additionally noted that, "in [the] absence of any rules or regulations of the United Nations in conflict with the local law, the local law applies".[10]

We now turn to the superior court's ruling in the present case.

*In Alaska, state-owned land within a municipality is not exempt from state statutes that prohibit people from violating a municipal ban on the importation and possession of alcoholic beverages*

We have been discussing the general question of whether a municipality can enforce its ordinances on state or federal land within its boundaries. But Prince's case does not raise this precise issue. It is true that the municipality of St. Mary's has enacted a local ban on the importation and possession of alcoholic beverages, but the municipality's power to enact such a ban is granted by state law (AS 04.11.491), and that ban is enforced by state law. Prince was charged with violating *state* criminal statutes: AS 04.16.200(e), which makes it a felony to transport or bring alcoholic beverages into a municipality that has prohibited the importation of alcoholic beverages, and AS 04.16.200(b), which makes it a felony to possess alcoholic beverages in a municipality that has banned their possession.

■ Thus, the question in Prince's case is whether people on state land are subject to *state statutes*—in particular, the statutes that enforce municipal bans on the importation and possession of alcoholic beverages. The answer is obviously yes.

The only remaining issue is the scope of these state criminal statutes. When the Alaska legislature chose to enforce municipal bans on alcoholic beverages by making it a crime under state law to violate these local bans, did the Alaska legislature intend to exempt people whose activities occur on state land located within municipal boundaries?

As explained earlier in this opinion, AS 04.11.491 authorizes municipal voters to enact "local option" ordinances—ordinances that restrict or prohibit the sale, importation, or possession of alcohol. Moreover, AS 29.35.080 expressly recognizes the authority of municipalities to "regulate the possession,

---

7. *Spingola,* 759 N.E.2d at 477.

8. *Weiner,* 378 N.Y.S.2d at 969.

9. *Id.* at 972.

10. *Id.*

barter, sale, importation, and consumption of alcoholic beverages" as prescribed in the local option statutes. Thus, a properly enacted municipal ban on alcoholic beverages does not conflict with state law; rather, it is consonant with state law.

Alaska law does contain provisions that limit the reach of a municipality's political authority over state land. See, for example, AS 29.45.030(a)(1), which prohibits a municipality from taxing property within its borders if that property is owned by the State, by the University of Alaska, by the Mental Health Trust, or by another municipality. But there is no similar statute that limits the reach of a municipal ban on the importation or possession of alcoholic beverages. Nowhere in the Alaska Statutes can we find any indication that the Alaska Legislature viewed state-owned land within municipalities as havens where people might go to avoid being prosecuted—under state criminal law—for violating a properly enacted local ban on the importation and possession of alcoholic beverages.

St. Mary's is a municipality whose voters have exercised their right under AS 04.11.491 to ban alcoholic beverages. Prince is charged with violating state law by importing alcoholic beverages into St. Mary's and possessing these beverages within the municipality's boundaries. Even though Prince's activities occurred on state-owned land within the municipality, he is still subject to the state statutes that forbid people from violating municipal restrictions on the importation and possession of alcoholic beverages. The superior court should have denied Prince's motion to dismiss the indictment.

### Conclusion

The judgement of the superior court is REVERSED. The indictment is reinstated, and this case is remanded to the superior court for further proceedings on that indictment.