# United States Court of Appeals
## For the First Circuit

No. 04-1275

PETER TORRÉNS, ET AL.,

Plaintiffs, Appellees,

v.

LOCKHEED MARTIN SERVICES GROUP, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, Senior U.S. District Judge]

Before

Boudin, Chief Judge,
Howard, Circuit Judge,
and Carter,[*] Senior District Judge.

Anabel Rodríguez-Alonso with whom Pedro Giner-Dapena and Schuster Usera & Aguiló LLP were on brief for appellant.
Mark B. Stern, Appellate Staff, Civil Division, Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, H. S. García, United States Attorney, and Johathan H. Levy, Appellate Staff, Civil Division, Department of Justice, were on brief for the United States of America, Amicus Curiae.
Mauricio Hernández-Arroyo with whom Law Offices of Mauricio Hernández-Arroyo, López-Lay Vizcarra & Simonet were on brief for appellees.

February 7, 2005

---

[*]Of the District of Maine, sitting by designation.

**BOUDIN**, <u>Chief Judge</u>.  The narrow but important question before us is whether certain property at U.S. Naval Station Roosevelt Roads in Puerto Rico is "federal enclave" property over which the federal government enjoys exclusive legislative jurisdiction (save as federal law may incorporate local law).  The question, on which district court judges in Puerto Rico have now reached conflicting results, is buried in a private law suit, now a decade old.

Roosevelt Roads was a Navy base (recently deactivated but still federally owned), primarily located at the eastern tip of Puerto Rico.  At its height, it was one of the largest naval facilities in the world.  The lands it occupied were acquired piecemeal, at different times, starting around 1940--through condemnation actions, reclamation, transfers of U.S. Army property, and the like.

Piers at the base jut into Puerca Bay and Ensenada Honda Bay, extending from land mostly created from fill.  On the filled land touching Puerca Bay, there is also a dry dock that extends inland, partly on filled land and partly on original upland.  These piers and the surrounding landfill--collectively, the "piers area"--are central to this case.  The large tract (just under 1,300 acres) from which the piers area extends was apparently acquired by the United States on November 18, 1941; and construction of the piers area--channel-dredging, landfilling, and building of the dry

dock--were all underway between 1941 and 1943. <u>Nieves</u> v. <u>Standard Dredging Corp.</u>, 152 F.2d 719, 719-20 (1st Cir. 1945).

In 1995, former employees of a government contractor--Lockheed Martin Services Group ("Lockheed") is the successor in interest--brought suit against the company in a local Puerto Rico court. The contractor provided maintenance and other services for the Navy at Roosevelt Roads. The suit sought overtime pay and other work-related relief under Puerto Rico wage and benefit laws for past work performed in the piers area and perhaps aboard ships docked at the piers.

After delay and appeals within the Puerto Rico court system caused by disputes over service of process, the case was proceeding forward in 1999, when the plaintiff employees added claims under the federal Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (2000). Based on the federal claims, Lockheed removed the case to federal court, 28 U.S.C. § 1441 (2000). It then sought dismissal of the original claims grounded on Puerto Rico law, asserting that federal law alone applied to work done within the Roosevelt Roads facility.

This contention rested on doctrine derived from a provision in the U.S. Constitution (article I, section 8, clause 17), sometimes described as the "enclave clause," which grants Congress power

> [t]o exercise exclusive Legislation in all
> Cases whatsoever . . . over all Places

> purchased by the Consent of the Legislature of the State in which the Same shall be for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

Under the enclave clause, a web of statutory provisions, practice and case law has developed to determine whether and when property acquired by the federal government meets the conditions for treatment as a federal enclave to which state regulation does not apply.[1]

This same regime of federal enclave law has regularly been assumed to apply in Puerto Rico even though it is a Commonwealth rather than a state (and therefore Congress might have designed a different regime for governing federal property there). The assumption is undisputed by the parties and (as will appear) is reflected in Puerto Rico legislation, in the past conduct of federal government officials and their analyses bearing on Roosevelt Roads, in prior case law that has dealt with Roosevelt Roads, and in the district court's decision in this case.

Under this body of federal enclave doctrine, a state does not lose its police powers over land acquired by the federal government--legislative jurisdiction may remain with the state,

---

[1]See, e.g., Paul v. United States, 371 U.S. 245, 263-67 (1963); James v. Dravo Contracting Co., 302 U.S. 134, 142, 147-49 (1937); Fort Leavenworth R.R. Co. v. Lowe, 114 U.S. 525, 528 (1885). See generally U.S. Interdepartmental Comm. for the Study of Jurisdiction over Federal Areas Within the States, Jurisdiction over Federal Areas Within the States, pt. 1 (G.P.O. 1956) & pt. 2 (G.P.O. 1957) [hereinafter Jurisdiction over Federal Areas].

subject always to overriding federal legislation--unless (1) the state consented to the land's acquisition or later ceded certain powers, (2) the federal government has assumed the ceded authority, and (3) the land's federal use is consistent with the enclave clause.  Paul, 371 U.S. at 263-67.

A 1903 Puerto Rico law granted blanket consent to any future acquisition by the United States of lands within Puerto Rico for "naval, military or other public purposes," providing also that on such acquisition "all jurisdiction over such lands" by Puerto Rico "shall cease and determine [sic]" so long as the United States retains the property.  Act of February 16, 1903, § 5, 1903 P.R. Laws, 110, 111-12.  This consent and cession provision, although superceded in 1955, see 28 P.R. Laws Ann. §§ 54-55 (1985), was still in force when much of Roosevelt Roads was acquired in the 1940s.

Prior to 1940, the prevailing understanding of the enclave clause was that the states' blanket cession statutes operated to "transfer" exclusive legislative jurisdiction to the United States once the federal government acquired the land.[2]  But in 1940, Congress passed a law specifying how the United States should assume exclusive jurisdiction if it wanted such authority

---

[2]See Fort Leavenworth, 114 U.S. at 528; Jurisdiction over Federal Areas, supra, pt. 2, at 47-54; Peter S. Twitty, U.S. Navy Dep't, The Respective Powers of the Federal and Local Governments Within Lands Owned or Occupied by the United States 12-13 (G.P.O. 1944).

and expressly instructing that "[u]nless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."  40 U.S.C. § 255 (2000).

Pertinently, the statute said that

the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated.

40 U.S.C. § 255 (emphasis supplied).

Prior to the present case, decisions in this circuit, and a decision of the Puerto Rico Supreme Court, had uniformly held or assumed that "federal enclave" status applies to Roosevelt Roads as a whole.[3]  However, in the district court the plaintiffs responded

---

[3]Dávila-Perez v. Lockheed-Martin Corp., 202 F.3d 464, 468 (1st Cir. 2000); Rivera de Leon v. Maxon Eng'g Servs., 283 F. Supp. 2d 550, 558 (D.P.R. 2003); Kelly v. Martin Marietta Servs. Group, 25 F. Supp. 2d 1, 3-4 (D.P.R. 1998); Koren v. Martin Marietta Servs., Inc., 997 F. Supp. 196, 200-02 (D.P.R. 1998); Sopeña v. Colejon Corp., 920 F. Supp. 259, 264 (D.P.R. 1996); Capitol Constr. v. Sec'y of Treasury, 89 P.R.R. 319, 323 (1963); cf. People of P.R. v. Koedel, 927 F.2d 662, 664-65 (1st Cir. 1991) (status of army base at Fort Buchanan).

-6-

to Lockheed's motion to dismiss local law claims by arguing, based in part upon a newly discovered Navy memorandum, that no such exclusive jurisdiction had been acquired by the United States over the piers area because--as to this area--the assumption requirements of the 1940 statute had never been met.  If that were so, local Puerto Rico law could of its own force apply to wage benefit issues in dispute in this case.

In a decision filed on April 8, 2003, the district court decided that the piers area is not part of a federal enclave, relying importantly on a 1976 internal Navy memorandum ("the Brooks memorandum") describing the piers, dry dock, and landfill at Roosevelt Roads as a location "in which [exclusive] federal jurisdiction is lacking."[4]  Given the conflict with earlier decisions and its importance, the district court certified Lockheed's petition for interlocutory appeal, see 28 U.S.C. § 1292(b) (2000), which we granted, inviting the views of the United States as amicus curiae.

In its amicus brief in this court, the United States asserts that it did acquire exclusive jurisdiction over the Roosevelt Roads piers area.  Further, it has produced a 1942 document, hitherto uncited in the district court or in prior cases,

_____

[4]The memorandum, dated November 30, 1976, was written by a Navy official named Joseph Brooks on behalf of the "Command Judge Advocate" to the "Head [of the] Naval Legal Service Branch Office." Its purpose was to describe the legal status of Navy property at Roosevelt Roads and other military commands in Puerto Rico.

which the United States says represents its specific formal acceptance of authority over the very area in Roosevelt Roads that is at issue in this case. We conclude that this new document requires a remand, but we resolve now as much as we properly can on this appeal.

It is common ground that, following the 1940 statute requiring a formal acceptance by the United States, the Secretary of War on July 27, 1945, wrote a letter accepting exclusive jurisdiction over all lands in Puerto Rico theretofore transferred to the United States for military purposes and as to which jurisdiction had not previously been accepted. Cf. Koren, 997 F. Supp. at 200-01. The district court ruled that this was insufficient to establish exclusive jurisdiction over the piers area, relying upon the conclusions of the Brooks memorandum supplied by plaintiffs in this case.

The Brooks memorandum has as its premise that the Secretary of War's letter does not cover Navy property[5] and, as to such Navy property, ascribes the acceptance of exclusive jurisdiction within Roosevelt Roads to specific documentation of individual parcels covering only about half the base. Local Navy

---

[5]The letter did not say expressly why it viewed the Secretary of War's July 1945 general acceptance as inadequate, but probably this rested on the 1940 statute's language requiring that authority be accepted by an official as to lands "under his immediate jurisdiction, custody, or control . . . ." Conceivably Brooks had no wish to concede that the Secretary of War had anything to say about Navy property.

officials, says the memorandum, had repeatedly sought an unequivocal acceptance by the Navy of exclusive jurisdiction over all Navy property at Roosevelt Roads but had never secured it.

Further, by other references, Brooks' memorandum listed the dry dock, piers, and related landfill as an area that he (or, strictly speaking, the Command Judge Advocate) regarded as <u>outside</u> the scope of any specific federal assumption of exclusive authority. The district court was persuaded by this conclusion-- the court properly treated the letter as informative rather than binding on the court--and ruled that the United States lacked exclusive federal authority over the piers area.

On this appeal, the United States says that no weight should be accorded to the views of a "mid-level" Navy officer whose position (it suggests) may have been a draft and was never expressly adopted by higher authority. However, bypassing any question as to the scope of the Secretary of War's general acceptance, the United States says that in any event there <u>is</u> an express acceptance of authority <u>by a Navy official</u> over the piers area. It attaches to its brief a copy of a letter, seemingly to this effect.

The letter, dated September 14, 1942, is from then-Acting Navy Secretary James Forrestal to the then-Governor of Puerto Rico, Rexford Tugwell. It begins by citing the 1940 statute requiring a notice of acceptance to be filed with the ceding state's governor.

It then describes, by date of condemnation and survey measurements, the specific parcel of just under 1,300 acres acquired in 1941 for fleet operating facilities and anchorage security. It concludes by saying that "jurisdiction" is "accepted" as to the property effective noon, September 30, 1942.

So far as the letter may apply to the piers area, it supercedes by its own force the concerns raised by the Brooks memorandum. The Brooks memorandum is not claimed to create an estoppel or an authorized renunciation of federal authority; whatever weight it has depends only on its persuasiveness. By its own terms it says that a specific Navy acceptance is needed for Navy property, such as the piers, dry dock, and landfill. The United States now tenders the Forrestal letter to fill this supposed gap, thereby quite possibly mooting the larger issue of the reach of the Secretary of War's letter.

The plaintiffs' answering brief does not directly address the Forrestal letter, which was not, of course, part of the district court record. At oral argument, plaintiffs' counsel did not suggest that the Forrestal letter was inauthentic or was merely a draft. The copy supplied to us bears a date, the stamped signature of a retained file copy (common enough before photocopying of originals was possible) and an obscured file stamp. We take government counsel to be representing that it is genuine and that the original was sent.

Nor would it matter that the letter has been belatedly obtained in this case. No final judgment exists, and the issue of exclusive federal authority vel non transcends the interests of the parties. We are free ourselves to take judicial notice of the existence of government records, Fed. R. Evid. 201(b)(2); see U.S. v. Bello, 194 F.3d 18, 23-24 (1st Cir. 1999); and the letter is relevant not for the truth of anything asserted in it but simply as a legally significant event, like a treaty or a will.

At oral argument plaintiffs' counsel did say briefly that the Forrestal letter did not "go to" the landfill issue. Although this comment was not developed, plaintiffs may be intending to suggest that the piers and dry dock where the plaintiffs worked may rest on or extend from land reclaimed from the water and therefore possibly not literally within the metes and bounds set out in the Forrestal letter as the parcel taken in 1941 and for which exclusive federal authority was accepted. This suggestion raises questions that we cannot entirely resolve on this appeal but may at least narrow.

From the maps and descriptions furnished, it appears that the Navy acquired in 1941 a significant piece of property bounded on one side by the bay. As Nieves indicates, construction of the piers area--channel-dredging, landfilling, and construction of the dry dock--proceeded apace between 1941 and 1943. 152 F.2d at 719-20. The United States asserts, and the plaintiffs have not

specifically disputed, that the property described in the Forrestal letter was the launching point for the piers area construction.

Whether the Navy built outward from the deeded land into the bay and whether the work at issue in this lawsuit occurred on the deeded property or the reclaimed land could be explored in the district court, if the issue matters; but it may well not matter. Assuming the Navy filled in submerged land that it did not already own under the strict terms of the deed or otherwise--an issue on which we take no view--the United States certainly took the land when the Navy occupied it and built its permanent facilities upon it. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 425-38 (1982).

If this is what happened, the Forrestal letter would nevertheless encompass that land as well as the expressly deeded property. The letter adverts to use of the deeded land for fleet operating facilities, and we know (see Nieves) that construction was underway when Secretary Forrestal wrote, specifically confirming the exclusive authority of the United States. He cannot have intended to exclude from the letter the very facilities being built then and there for fleet operations, Congressional authority for which was cited in the letter itself.

We decide only that the Forrestal letter, assuming that it is authentic and was sent, would constitute an acceptance of federal authority under the 1940 statute for the parcel it

describes, any adjacent land reclaimed from the bay, and any piers and dry docks built upon the parcel or the reclaimed land. Plaintiffs are free on remand _inter alia_ to dispute the authenticity of the Forrestal letter, to show that the plaintiffs' work occurred somewhere entirely different, or to debate the impact of exclusive federal authority upon their local law claims.

We _vacate_ the order of the district court determining that the United States lacks exclusive authority over the piers area at Roosevelt Roads and _remand_ for further proceedings consistent with this decision. Each side shall bear its own costs on this appeal.

_It is so ordered_.